## CITY OF MINNEAPOLIS *v.* MINNEAPOLIS STREET RAILWAY COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

No. 46. Argued December 2, 3, 1909.—Decided January 3, 1910.

This court will consider the nature of a corporation organized under a state law only so far as may be necessary to determine Federal rights.

Franchises to public service corporations will not be. extended by implication, but whatever is plainly and legally granted is protected by the contract clause of the Constitution.

Where the corporate existence has been recognized after the expiration of the shorter period and the State has not moved in *quo warranto*, a franchise legally granted by municipal ordinance and legislative enactment for the life of the charter of a public service corporation cannot be impaired during the term specified in the charter filed before the grant was made, although such term be longer than that allowed by the act under which the corporation was organized.

A franchise contract may extend beyond the life of the corporation to which it is granted; at the end of the corporate life it is a divisible asset.

An ordinance enacted before electricity was used as motive power prohibiting any power that would be a public nuisance will not be construed as excluding electricity; and a public service corporation accepting an ordinance permitting change from horse to electric power does not abandon its rights under the original ordinance so that they are no longer protected by the contract clause of the Constitution.

Where all that is necessary is to determine whether a right under a state charter is now in existence, the decree should be confined thereto, and should not attempt to determine the further duration of the charter under state statutes.

Waiver to a reasonable extent of certain privileges under a franchise does not withdraw the other privileges from the protection of the contract clause of the Constitution.

The ordinance granted by the city of Minneapolis, in 1875, to the Minneapolis Street Railway for the life of its charter continues for fifty years from 1873, when the corporation was organized, and the fare cannot be reduced during that period below five cents; and the ordinance of 1907, directing the sale of six tickets for twenty-five cents is void under the contract clause of the Constitution.

THE facts, which involve the franchise of the Minneapolis Street Railway Company and whether the obligation of its contract was impaired by a subsequent ordinance, requiring it to sell six tickets for twenty-five cents, are stated in the opinion.

*Mr. William A. Lancaster*, with whom *Mr. Frank Healy* and *Mr. John F. McGee* were on the brief, for appellants:

The corporation was organized in 1873 under Title II and not Title I of Ch. 34, Minn. Revision of 1866, as amended in 1868 and 1873; the life of the charter was necessarily limited to thirty years, and contract rights, if any existed, terminated in 1903, as they were limited to the term of the charter. In fact, the provisions of Title I repel the idea that § 1 was intended to authorize the formation of street railway corporations.

The word "railroad" or "railway" as used in Title I includes only commercial steam railroads and does not include street railways which fall under the head of transportation as used in Title II. *Manhattan Trust Co.* v. *Sioux City Cable Ry.*, 68 Fed. Rep. 82; *Williams* v. *Railway Co.*, 41 Fed. Rep.

556; Chap. 5, McClain's Iowa Code; *Sears* v. *Marshalltown St. Ry. Co.*, 65 Iowa, 742; *Fidelity Trust Co.* v. *Douglass*, 73 N. W. Rep. 1039; *Mass. Trust Co.* v. *Hamilton*, 88 Fed. Rep. 588; Sutherland on Stat. Con., § 241; *Freiday* v. *Sioux City Co.*, 60 N. W. Rep. 656; *Thompson* v. *Simon*, 20 Oregon, 60.

A general term will be given a restricted construction when other provisions in the same section point unmistakably thereto. *Dieler* v. *Estill*, 22 S. E. Rep. 622; *Railway Co.* v. *Cedar Rapids*, 76 N. W. Rep. 728; *Trust Co.* v. *Warren*, 121 Fed. Rep. 323.

The ordinances of 1875, and 1878, as ratified by the legislature in March, 1879, do not constitute a contract for the life of the charter that the street railway company can always charge five cents whether operated as a horse or an electric road. That right only extended so long as it was operated as a horse railroad. *Omaha Horse Ry.* v. *Cable Co.*, 30 Fed. Rep. 324. Grants of this nature are construed strictly for the public interests. *Perrine* v. *Canal Co.*, 9 How. 172; *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 422; *Bridge Proprietors* v. *Hoboken*, 1 Wall. 116; *Indianapolis Cable Ry.* v. *Citizens' Ry.*, 127 Indiana, 369; *Railway* v. *Denver City Ry.*, 2 Colorado, 673; *Third Ave. Ry.* v. *Newton*, 1 N. Y. Supp. 197; *North Chicago Ry.* v. *Lakeview*, 105 Illinois, 207; *Stein* v. *Bienville Water Co.*, 34 Fed. Rep. 145; affirmed, 141 U. S. 67; *Gas Light Co.* v. *Saginaw*, 28 Fed. Rep. 529; *Water Co.* v. *Knoxville*, 189 U. S. 434; *Slidell* v. *Grandjean*, 111 U. S. 412; *Coosaw Mining Co.* v. *South Carolina*, 144 U. S. 550; *Stanislaus County* v. *Irrigation Co.*, 192 U. S. 201; *Owensboro* v. *Waterworks Co.*, 191 U. S. 358; *Telephone Co.* v. *Los Angeles*, 211 U. S. 265; *Gaslight Co.* v. *Chicago*, 194 U. S. 1; *Minn. & St. L. Ry.* v. *Gardner*, 177 U. S. 332; *Turnpike Co.* v. *Sandford*, 164 U. S. 578; *Teachout* v. *Street Railway Co.*, 38 N. W. Rep. 145. These cases hold that a horse street railway and an electric street railway are separate and distinct; that there was reserved to the city full power to grant to any other corporation the right to build and operate an electric road; and that as the ordinance

of 1907 related to an electric road it does not impair the contract, if any, with the company operating a horse railroad.

The right to make such ordinance was under the general reserved power of the city and State, and all such grants are to be construed liberally for the public under the reserved powers. *Water Co. v. Freeport*, 180 U. S. 587. Corporations accept such grants subject to all reservations. *Telephone Co. v. Richmond*, 98 Fed. Rep. 671; *S. C.*, 103 Fed. Rep. 31; *Detroit v. Railway Co.*, 185 U. S. 388; *Fath v. Tower Grove Ry.*, 16 S. W. Rep. 913; *General Ry. Co. v. Chicago*, 52 N. E. Rep. 880; *Blair v. Chicago*, 201 U. S. 487; *Jackson Ry. Co. v. Interstate Ry. Co.*, 24 Fed. Rep. 306; *Commonwealth v. Railway*, 27 Pa. St. 339. And see 21 Pa. St. 22; *Farrell v. Railway Co.*, 61 Connecticut, 127; Endlich on Interpretation, § 354.

Public policy does not permit unnecessary inference of authority to make a contract which affects the continuance of the sovereign power and duty to make such laws as public welfare may require. *Long v. Duluth*, 49 Minnesota, 281; *Georgia Banking Co. v. Smith*, 128 U. S. 174; *Stone v. Trust Co.*, 116 U. S. 307, 326. See also *Fanning v. Gregoire*, 16 How. 530; *Gaslight Co. v. Middletown*, 59 N. Y. 229; *Minturn v. Larue*, 23 How. 435; *Hoffmann v. Quincy*, 4 Wall. 435; *Alcott v. Supervisors*, 16 Wall. 678; *Water Co. v. Syracuse*, 116 N. Y. 167; *Indianapolis Ry. Co. v. Street Railway Co.*, 127 Indiana, 369; Elliott on Roads and Streets, 2d ed., § 736; *Electric Ry. Co. v. Cleveland*, 204 U. S. 116.

The burden is on appellee to show the existence of the contract.

*Mr. M. B. Koon*, with whom *Mr. N. M. Thygeson* and *Mr. M. D. Munn* were on the brief, for appellee.

MR. JUSTICE DAY delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States for the District of Minnesota, enjoining the city

of Minneapolis from enforcing, as against the Minneapolis Street Railway Company, appellee, a certain ordinance of the city of Minneapolis, passed February 9, 1907, prescribing the rate of fare for the transportation of passengers over any street railway line, or lines, of the company in the city of Minneapolis.

The case was tried upon amended bill and answer. The ground alleged for injunction in the amended bill was in substance that the ordinance of February 9, 1907, violated the terms of a previous and subsisting contract, prescribing the rates of fare to be charged by the company in the city of Minneapolis. It appears in the record that the railway company was organized on July 1, 1873, and that its alleged contract arises from an ordinance of the city of Minneapolis passed July 9, 1875, ratified by an act of the legislature of the State of Minnesota passed March 4, 1879. We shall have occasion later on to deal more specifically with this ordinance and ratifying act.

It is sufficient for the present purpose to say that it is the contention of the company that by the ordinance of July 9, 1875, and the ratifying act, it became the owner of an irrepealable contract for the term of fifty years from the date of its organization, by the terms of which it had the right to charge a fare not exceeding five cents for each person carried on any continuous line which might be designated by the city council of the city, such continuous line, however, not to exceed three miles in length. The contract, it is alleged, is violated by the ordinance of February 9, 1907, requiring the sale of six tickets for twenty-five cents.

The existence of the alleged contract is denied by the city upon several grounds. It is urged that the complainant company was so organized that its charter, and consequently its corporate life, expired thirty years after the date of its incorporation, that is, on July 1, 1903, and, therefore, its contract rights, ceased and terminated at that time. This contention is based upon the incorporation of the company, which,

it is insisted, could only be under Title IV of the laws of Minnesota, ·which includes transportation and other lawful business, and limits corporations organized thereunder to a continuation for not more than thirty years. Bissell's Stats. of Minn. 1873, p. 443.

It is the contention of the company that it was organized under Title I of the laws of Minnesota (Bissell's Stats. 1873, p. 419), for a term of fifty years. Title I is headed "Of corporations empowered to take private property for public uses," and includes corporations "for the·purpose of building, improving and. operating railways, . . . and all works of internal improvement which require the taking of private property or any easement therein." Pertinent provisions of Title I as to incorporation are given in the margin.[1]

---

[1] Title I.

Of corporations empowered to take private property for public uses.

SEC. 1. Any number of persons, not less than five, may associate themselves and become incorporated for the purpose of building, improving, and operating railways, telegraphs, canals, or slackwater navigation, upon any river or lake, and all works of internal improvement which require the taking of private property or any easement therein.

SEC. 2. They shall. organize by adopting and signing articles of incorporation, which shall be recorded in the office of the register of deeds of the county where the principal place of business is to be, and also in the office of the Secretary of State in. books kept for such purposes.

SEC. 3. . . .

Said articles shall contain:

First. The name of the corporation, the general nature of its business, and the principal place, if any, of transacting the same.

Second. The time of commencement and the period of continuance of said corporation.

Third. The amount of capital stock of said corporation, and how to be paid in.

Fourth. The highest amount of indebtedness or liability to which said corporation shall at any time be subject.

Fifth. The names and places of residence of the persons forming such association for incorporation.

Title II is "Of corporations for pecuniary profit other than those named in Title I." The pertinent parts of that title are given in the margin.[1]

Sixth. The names of the first board of directors, and in what officers or persons the government of the corporation and the management of its affairs shall be vested, and when the same are elected.

Seventh. The number and amount of the shares in the capital stock of said corporation.  .  .  .

SEC. 4. When articles are filed, recorded and published, as aforesaid, the persons named as corporators therein become a body corporate [provisions follow in this section as to management of business, amendment of articles of incorporation, etc.].

SEC. 5. No such corporation shall be formed to continue more than fifty years in the first instance, but it may be renewed ·from time to time for periods not longer than fifty years: Provided, that three-fourths of the votes cast at any regular election for the purpose are in favor of such renewal, and those desiring a renewal purchase the stock of those opposed thereto at its current value.

[1] Title IV. (This is Title II of Chapter XXXIV of the Statutes of 1866.) Of corporations for pecuniary profit other than those named in Title I.

Sec. 98 (45, as amended by act of March 10, 1873). Any number of persons not less than three, who have or shall, by articles of agreement in writing, associate according to the provisions of this title under any name assumed by them for the purpose of engaging in and carrying on the business of mining, smelting or manufacturing iron, copper, or other minerals, or for producing the precious metals, or for quarrying and marketing any kind of ore, stone, slate or other mineral substance, or for constructing, leasing or operating docks, warehouses, elevators or hotels, or as a mutual savings fund, loan or building association, manufacturing gas, or for any kind of manufacturing, lumbering, agricultural, mechanical, mercantile, chemical, transportation or other lawful business, and who have or shall comply with the provisions of this title, shall, with their associates, successors, and assigns, constitute a body corporate and politic under the name assumed by them in their articles of agreement; *provided*, no company shall take a name previously assumed by any other company. Any mutual saving fund, loan or building association, is authorized to loan funds and to secure such loans by mortgage or other security, and any premiums taken by any such association for the preference or priority of such loans, shall not be deemed interest within the meaning of section one of chapter twenty-three of the general statutes. Any such association is

Much of the elaborate briefs of counsel in this case is devoted to a discussion of the question of the organization of this corporation, and as to whether it was under the one title or the other. This is not a proceeding in *quo warranto*, and the jurisdiction of the Federal court rested upon the contention that the company has a contract right protected from impairment by a legislative act of the State. It is only necessary to examine the question of the incorporation and organization of the company so far as is required to determine whether or not this alleged contract right exists, and whether it has been violated by the ordinance of the city of Minneapolis, attacked in the amended bill.

There can be no question that the attempted incorporation of this company was under Title I of the statutes already referred to. It was incorporated by five persons. It states the business for which it was formed, "to construct and operate

authorized and empowered to purchase at any sheriff's or other judicial sale, or at any other sale, public or private, any real estate, upon which such association may have or hold any mortgage, judgment, or lien, or other incumbrance, or in which such association may have an interest, and the real estate so purchased, to sell, convey, lease, or mortgage at pleasure, to any person or persons whatsoever.

SEC. 99 (46, as amended by act of February 28, 1870). The provisions of sections two, three, four, seven, eight, nine, ten, eleven, forty-two, and forty-four of title one shall apply to and be observed by corporations organizing under this title.

SEC. 100 (47, as amended by act of February 27, 1873). The amount of capital stock in any such corporation shall in no case be less than ten thousand dollars nor more than five hundred thousand dollars, and shall be divided into shares of not less than ten dollars nor more than fifty dollars each, except that the capital stock of mutual building and loan associations may be divided into shares of two hundred dollars each, but the capital stock and number of shares may be increased at any regular meeting of the stockholders; provided, the capital stock when so increased shall not exceed five hundred thousand dollars.

＊      ＊      ＊      ＊      ＊      ＊      ＊      ＊

SEC. 105 (52). No corporation shall be formed under this title to continue more than thirty years.

railways in the streets and highways of the city of Minneapolis and its suburbs in the county of Hennepin, State of Minnesota." It states the time of the commencement of the corporation to be the first of July, 1873, and the period of continuance thereof to be fifty years thereafter. The shares of capital stock are twenty-five hundred at $100 each.

Under Title II the corporate life is limited to not more than thirty years, and the shares of capital stock are to be not less than $10 or more than $50 each.

The corporation has continued to act since the expiration of the thirty years which would have been its corporate life had it been organized under Title II. There have been no proceedings, so far as the record shows, to inquire into its corporate existence since the expiration of the thirty years, and this record discloses that a number of ordinances have been passed by the city of Minneapolis since July 1, 1903, requiring of the corporation the construction of additional lines of railway upon certain of the streets of the city of Minneapolis, and to otherwise discharge its duties as a continuing corporation.

This record therefore shows that the company undertook to organize under Title I, for the period of fifty years, has continued to act as such corporation, and was so acting at the time of the passage of the ordinance of February 9, 1907.

We proceed to examine the question, Did the ordinance of July 9, 1875, together with the ratifying act of 1879, make a contract between the city of Minneapolis and the street railway company, which would endure for the period of fifty years? Section I of the ordinance of July 9, 1875, provides:

"SEC. I. That the Minneapolis Street Railway Company be and is hereby granted, during the term of its charter, the exclusive right and privilege of constructing and operating a single or double track for a passenger railway line, with all necessary tracks for turnouts, sidetracks and switches, in such streets of said city as the city council may deem suited to street railways, subject to the terms, conditions and forfeitures hereinafter contained; provided, that the city council reserves the

right to limit the said company to the construction of a single track upon such street or streets as it may deem proper.

Section VIII of the same ordinance provides:

"SEC. VIII. The said company may regulate and establish from time to time such rates of fare for the transportation of passengers and freight over its lines of railway as it may deem proper; provided, that the charge for carrying a person, including hand baggage, from one point to another within the city limits, whether by one or more lines operated by the same company shall not exceed five cents on any one line; provided, further, that the city of Minneapolis hereby reserves the right to alter and regulate the rate to be charged by the said companies, their successors and assigns, for the transportation of passengers and freight at the expiration of five years from the approval of this ordinance, and every five years thereafter, fixing the same at such rates as the city council of said city may deem just and reasonable; provided, that the city shall not reduce the passenger's fare below five cents, over any one continuous line, and what shall be considered a continuous line may be designated by the city council of the said city, but that said council shall not designate any such continuous line to be more than three miles in length."

Section XVII of the ordinance provides:

"SEC. XVII. Within thirty days from the publication of this ordinance said company shall file with the city clerk a written acceptance of the grants hereinabove made, with the conditions, regulations and limitations above expressed, signed by the president and secretary of said company; and when so accepted this ordinance shall operate as a contract between the city and said company, and upon failure to file such acceptance as aforesaid, then the above grant shall not become operative to vest any rights, privileges or franchises whatsoever."

It also appears that the company filed its acceptance in writing of the ordinance on August 18, 1875.

In considering the terms of this ordinance and what it undertook to accomplish on its face, we are to bear in mind that public grants of this character are not to be extended by implication, and that all that is granted must be found in the plain terms of the act. This principle has been so frequently and recently announced in this court that it is unnecessary to cite the cases which have established it. Recognizing this principle, it must also be remembered, that grants of the character of the one under consideration here, when embodying the terms of a contract, are protected by the Federal Constitution from impairment by subsequent state legislation, and notwithstanding the principle of strict construction, whatever is plainly granted cannot be taken from the parties entitled thereto by such legislative enactments. Statutes and ordinances of this character are not to be extended by construction, nor should they be deprived of their meaning, if it is plainly and clearly expressed.

Examining this ordinance in the light of these principles, there is no ambiguity in section VIII, which gives to the city the right to regulate the fares to be charged, provided the same are not reduced below five cents for each passenger over any one continuous line, to be designated by the city, of not more than three miles in length. By § I of the same ordinance the right and privilege of constructing and operating a railway line subject to the terms, conditions and forfeitures named in the ordinance is granted to the street railway company "during the term of its charter."

What did this mean? The company had undertaken to organize, and filed its certificate of incorporation—which is its charter under the laws of Minnesota—and had therein stated its term of existence to be for fifty years from the first day of July, 1873. There was a positive requirement of the law that this period of duration should be stated in the certificate filed for the purpose of procuring incorporation, and it was there found, and was duly filed, recorded and published as required by law.

It is unreasonable to suppose that the city and the company at that time entered into any inquiry or controversy as to whether the company could lawfully incorporate for more than thirty years. The charter referred to in the ordinance could not have been anything else than the certificate of incorporation required by law. Of this the city was bound to take notice, and when it granted the privileges "during the term of the charter," it could have meant nothing less than during the period named in the charter. As was declared by the Supreme Court of Minnesota in *City of Duluth* v. *Duluth Gas and Water Company*, 45 Minnesota, 210, 214, a case involving the extent of rights conferred upon a water company by a city ordinance, "The council must be held, when dealing with defendant, to know its character, its purposes, and powers, as disclosed by its articles of incorporation."

We come now to the terms of the ratifying act of March 4, 1879. Laws of Minn., 1879, p. 410, c. 299. This act is as follows:

"An act to confirm the grant of the city of Minneapolis to the Minneapolis Street Railway Company.

"Be it enacted by the Legislature of the State of Minnesota:

"SEC. I. That whereas, the city of Minneapolis did, by an ordinance entitled 'An ordinance authorizing and regulating street railways in the city of Minneapolis,' passed by the city council of said city on the ninth (9th) day of July, one thousand eight hundred and seventy-five (1875), and approved by the mayor of said city on the seventeenth (17th) day of July, one thousand eight hundred and seventy-five (1875), and by an ordinance passed July third (3d), one thousand eight hundred and seventy-eight (1878), and amended July eighth (8th), one thousand eight hundred and seventy-eight (1878), and approved July tenth (10th), one thousand eight hundred and seventy-eight (1878), grant to the Minneapolis Street Railway Company the right to construct and maintain a street railway through the streets of

said city, with certain rights and privileges in said ordinance particularly set forth. Now the said right to construct and maintain said street railway through the streets of said city, with the rights and privileges as set forth and qualified in said ordinance, is hereby legalized and granted to said company.

"Sec. 2. This act shall take effect and be in force from and after its passage."

The ordinances of July, 1878, referred to in the ratifying act, concerned certain streets in the city of Minneapolis, and are not important to be considered in this connection.

It has not been suggested in the elaborate briefs presented by the learned counsel for the city, that the state legislature at that time had not the constitutional right to pass this ratifying act.

In *Green* v. *Knife Falls Boom Corporation,* 35 Minnesota, 155, the Supreme Court of Minnesota sustained a special law conferring new, and independent franchises, and enlarged powers upon the boom company, a corporation organized under Title II, and, originally not having the power of eminent domain, nor to take tolls, nor to obstruct the navigable portions of the St. Louis River.

By the special act the corporation was given power over the navigation and use of the river as respects the passage of logs, the power to exercise the right of eminent domain was conferred upon it, the right to charge toll upon all logs passed through their works, and to receive and take entire charge and control of timber which might run or be driven through the same, and to boom, scale and deliver such timber, as provided in the act, with a lien upon all such logs, which might be enforced by sale.

It was held that, by a long course of legislation and practical construction, such legislation was justified and ought not to be disturbed. The constitutional amendment of 1881, it was said, made such legislation impossible thereafter, because the legislature is therein prohibited from enacting any special,

or private laws, in the following cases: ". . . For grant-
ing corporate powers, or privileges, except to cities." In this
case the court referred to *Ames* v. *Lake Superior & Miss.
R. R. Co.*, 21 Minnesota, 241, in which it seems to be held
that under the former constitution, prohibiting the formation
of corporations, except for municipal purposes, under special
acts, such special acts stopping short of creating new cor-
porations, might be passed by the legislature. See opinion
upon rehearing, pages 284, 285.

Looking to the terms of the act of March 4, 1879, we find
that the right to construct and maintain the street railway
upon the streets of the city, with the rights and privileges as
set forth and qualified in the ordinance, is "legalized and
granted to said company." Language could scarcely be
plainer, and, if we are correct in construing the ordinance,
as granting the right and privilege of maintaining railways
in the streets of Minneapolis, for the charter term of fifty
years, upon the terms therein mentioned, a vital part of
which concerns the right of the company to charge a certain
fare for passengers carried, it follows that this privilege, with
the others, was vested in the company by the legislature of
the State of Minnesota.

We may note in this connection that the mere fact that a
contract may extend beyond the term of the life of a corpora-
tion does not destroy it. This principle was recognized by
this court in *Detroit* v. *Detroit Citizens' Street Railway Co.*,
184 U. S. 368, in which it was held that a city ordinance
granting the use of the streets of the city for a term which
would extend the grant for sixteen years beyond the life of
the corporation did not invalidate it. It was held that the
limitation upon the corporate life of the company did not
prevent it from taking franchises, or other property, the title
to which would not expire with the corporation itself; and
further, that at the end of its corporate life, if such property
were still in existence, it would be an asset divisible among
the shareholders after the payment of debts, or it might, if

assignable, be transferred to any other person, or company, competent to hold it.

The ratifying act, being within the power of the legislature, vested this contract right in the company, notwithstanding the want of power in the city to make it at the time it was entered into. *Nash* v. *Lowry*, 37 Minnesota, 261.

The principle is well stated by Morawetz in his work on Corporations, vol. 1, § 319, 2d ed.:

"Where the legislature, by statute, recognizes and acquiesces in the existence of a corporation which was formed by the corporators without the proper authority, it thereby invests the association with the right of continuing to act in a corporate capacity for the purposes and in the manner that it publicly assumed to act. And if rights or franchises are conferred upon an association claiming to be incorporated, it thereby becomes authorized to exercise the powers expressly conferred, and such others as the legislature appears to have imputed to it."

See as to effect of validating acts, *Los Angeles* v. *Los Angeles City Water Co.*, 177 U. S. 558; *Blair* v. *Chicago*, 201 U. S. 400, 454.

But, it is contended, if a contract is found to exist, its rights were lost by virtue of the ordinance of September 19, 1890, authorizing the street railway company to change its mode of operation from the use of horse power to electricity. It is insisted that by the acceptance of the electrical power ordinance the company abandoned any rights it had under the ordinance of 1875 and the ratifying act of 1879; and, furthermore, that by the express terms of the ordinance of September 19, 1890, the right to control the future rates of fare was thereby vested in the city to an extent unlimited, except by constitutional inhibitions against confiscatory legislation.

As to the termination of the rights of the company by reason of the substitution of electricity for horse power, is there such abandonment of the rights originally secured that they no longer exist? It is contended that the original ordinance

was limited to the right to operate street railways by horse or pneumatic power, and that when the ordinance of September 20, 1890, was passed conditions were entirely changed, and a new and different mode of operation was substituted, and rights existing under the original ordinance were terminated and abandoned.

Let us see if the ordinance of 1875 was limited to the use of animal or pneumatic power. Section IV of that ordinance provides:

"SEC. IV. The cars to be used upon such tracks shall be propelled with either animal or pneumatic power, as the said company deem advisable, provided that no propelling power or machinery of any sort shall be used after it shall prove to be a public nuisance, and said company may connect with any other railway upon which power is used similar to that authorized to be used on street railways by the city council; but no locomotive, freight or passenger car, such as are usually run over the general railways of this State for the transportation of freight and passengers, shall be used upon any of said tracks, unless authorized by the city council; provided, that the said Minneapolis Street Railway Company, and any other street railway company which the council may charter under section 3 of this ordinance, shall each allow the other to connect with and jointly use such portions of the track belonging to each as the convenience of the traveling public may require, upon such equitable terms as may be agreed upon by the said companies, or as may be determined by the District Court of Hennepin County."

There can be no doubt that, in the then state of the art, the use of electric power as the means of operating the cars of the company was not specifically in contemplation. While pneumatic power is also suggested, there does not seem to be any means of operation by that method. That the use of other motive power might be developed in the progress of street railway operation, we think, was clearly indicated in the ordinance itself. For while animal or pneumatic power is

named, it is provided that no propelling power shall be used after it shall be proved a public nuisance, and that the company might connect with other street railroads upon which power is used similar to that authorized to be used by street railways by the city council, but steam power cars, such as are in common use, should not be used upon the city tracks, unless so authorized by the city council.

In these terms of the ordinance it is evident that the parties had in mind that other propelling power might be developed, and it was the purpose of the city council to keep control of its use so as to prevent it from becoming a public nuisance in the streets. There was no positive limitation to animal power and the possible progress and improvement in the means of propelling cars, contemplated by the parties, was carried into effect when the city passed, and the company accepted, the ordinance of September 19, 1890. By that ordinance the railway company was authorized to operate all its existing lines, and all its lines to be thereafter constructed in the city, by electricity as the motive power.

Section VIII of that ordinance provides:

"Sec. VIII. In the construction, maintenance and operation of said lines of street railway, said Minneapolis Street Railway Company, its successors and assigns, shall at all times be subject to all the conditions and limitations and other provisions of an ordinance entitled 'An ordinance authorizing and regulating street railways in the city of Minneapolis,' passed July 9, 1875, and approved July 17, 1875, as the same has been amended and is now in force, and all other ordinances of said city now in force or hereafter adopted, so far as applicable."

It is the contention of the city that by the terms of this ordinance the street railway company became subject to regulation by the ordinances of the city then in force, or thereafter adopted, including the right to regulate and control the amount to be charged for fares for the transportation of passengers.

In construing this section we must bear in mind that the company then had, as we have heretofore said, a contract upon the subject of fares, which limited the city in its right to regulate the same to a reduction not below five cents per passenger upon any one, continuous line. It needs no argument to demonstrate that the right to charge passenger fares is of the very essence of the contract, essential to the operation and success of the enterprise. *Detroit* v. *Detroit Citizens' Street Railway Co.*, 184 U. S. 368, 384.

In section VI of the ordinance of September 19, 1890, it is provided:

"SEC. VI. Passenger cars on all said lines shall run between extreme limits on all extensions to or near the intersection of Washington avenue with Hennepin avenue, without change to passengers traveling thereon, and after November 1, 1890, said street railway company shall issue transfer checks at the junction of said lines at Washington and Hennepin avenues, to any passenger on any of said lines, who shall pay one full fare, which transfer check shall entitle passenger so receiving the same to a continuous passage on either of said connecting lines; provided, that no passenger shall be entitled to more than one transfer check for one fare; and provided further, that said transfer check shall be used only by the person receiving the same for a continuous passage, and shall be used on the next car departing on the connecting line upon which it is to be used. And, if any of the lines of said railway do not connect at said Washington and Hennepin avenues, transfer checks shall be given at the point nearest to the crossing of Washington and Hennepin avenues, where such lines do connect with a line reaching said junction point at Washington and Hennepin avenues."

This is the only section which mentions the subject of fares, and it is therein provided that transfer checks may be issued at certain points to persons paying "one full fare," the transfer check to be used only by the person receiving the same, for one continuous passage.

The rate of fare had been fixed in the ordinance of July 9, 1875, and if it was intended to change it it would seem clear that the parties would have entered into new negotiations concerning it, and would have adopted, if that was desirable, some definite measure concerning it. The ordinance of July 9, 1875, was not attempted to be repealed, and is referred to in section VIII of the ordinance of September 19, 1890, "as the same as has been amended, and as now in force," and adopted, "so far as applicable," concerning the things mentioned in section VIII.

It is true that by the ordinance of July 9, 1875, there was no right to reduce the passenger fare below five cents over any one continuous line not more than three miles in length, to be designated by the city council. By the terms of the ordinance of September 19, 1890, transfers were to be allowed, so that, for one full fare, a passenger might receive a continuous trip very considerably exceeding three miles in length —it is stated in one of the briefs to include a trip of eleven miles.   But we do not understand that the acceptance of this regulation had the effect to abrogate the contract as to the right to charge a fare of five cents over one continuous line, that is, for one continuous passage.   Acquiescence in a regulation which may not have been deemed injurious, and may have been deemed wise and expedient, does not preclude a contest against the enforcement of regulations which are injurious and violative of contract rights.   *Los Angeles* v. *Los Angeles City Water Co.*, 177 U. S. 558, 579.

The right to future control under section VIII was to include the "construction, maintenance, and operation" of the lines of the street railway company.   Did this undertaking have the effect to abrogate the contract right already existing, and to subject the company for the future as to the right to charge fares, to the discretion of the city council?   Or, do the terms "construction, maintenance, and operation" have reference to the manner of carrying on the business of the road, the laying of its tracks, the use of the streets, the keeping up of

the equipment, the safety of the passengers and the public, and similar matters not involving the right to charge fares? We think these terms refer to the latter class of rights and privileges. Such is the import of the words used, and the subject of rates of fare is not mentioned. The case already referred to, *Detroit* v. *Detroit Citizens' Rwy. Co.*, 184 U. S. 368, is an instructive one upon this point. In that case it was held that a street railway company having a valid contract, giving it the right to charge five cents for the transportation of each passenger, did not lose that right by accepting the terms of an ordinance reserving the right to make such further rules, orders and regulations as to the city council may seem proper. *Wilson* v. *Standefer*, 184 U. S. 399.

We therefore reach the conclusion that when the ordinance complained of, that of February 9, 1907, was enacted by the city council, the company was the owner of a valuable contract right secured to it by the ordinance of July, 1875, ratified by the enactment of the legislature of the State of Minnesota on March 4, 1879, which secured to the company for fifty years from July 1, 1873, the contract right to charge five cents per passenger for one continuous trip. We think that the requirement of the ordinance, that the company should operate its roads by the sale of tickets six for a quarter, as required by the ordinance of February 9, 1907, was an enactment by legislative authority which impaired the obligation of the contract thus held and owned by the complainant company. We therefore reach the conclusion that the decree of the Circuit Court enjoining the execution of the ordinance, for the reasons stated, should be affirmed.

An examination of the decree, however, shows that it goes beyond the necessities of the case in specifically decreeing that the complainant company is a corporation organized under Title I of chapter 34 of the Statutes of Minnesota for the year 1866, with charter rights as alleged in the amended bill. It also decrees that the contract under the ordinances of July 9, 1875, and July 18, 1878, as ratified by the act of

March 4, 1879, constituted a contract for and during the term of complainant's charter, as alleged in the amended bill. In the amended bill it is alleged that the charter rights of the company were extended to March 1, 1937; this is undoubtedly averred because of the amendment to the charter which appears in the record, extending the term of the company's corporate life until that time. The decree as it stands might be construed as establishing a contract to endure until March, 1937.

All that was necessary to adjudge was that the company, by virtue of the ordinance of July 9, 1875, as amended in July, 1878, as ratified and confirmed by the act of the legislature of the State of Minnesota of March 4, 1879, constituted a valid contract for the term of fifty years from July 1, 1873, which is still so far in force as to prevent the city council from reducing the rate of fare below the sum of five cents for each passenger for one continuous passage, and enjoining the city from publishing and enforcing the ordinance of February 9, 1907, because the same impaired the obligation of the subsisting contract aforesaid.

The decree of the Circuit Court should be modified so as to meet these requirements, and, so modified,

*Affirmed.*