June 7,
1932.

FRED LORENZ & a v. ROBERT B. STEARNS, *Receiver.*

*Francis W. Johnston,* attorney-general, and *Ralph W. Davis* (*Mr. Davis* orally), for the plaintiffs.

*Choate, Hall & Stewart* (of Massachusetts) and *Demond, Woodworth, Sulloway & Rogers* (*Mr. Charles B. Pengra* and *Mr. Demond* orally), for the receiver.

*Weld A. Rollins* (of Massachusetts) and *Demond, Woodworth, Sulloway & Rogers* (*Mr. Rollins* orally), for the railway bondholders.

PEASLEE, C. J.    I. Questions have been raised as to the extent of the rights of the receiver and the bondholders, as compared with those of the Land company through which they claim.   The receiver has the rights of the railway.   The bondholders also stand upon the rights of their mortgagor, which is the same railway.   The execution of the mortgage and sale of the bonds did not enlarge the mortgaged rights.   The bondholders "contracted subject not paramount to the proviso for repeal." *Calder* v. *Michigan,* 218 U. S. 591, 599.   And by express provision of the act authorizing the sale (Laws 1913, *c.* 332, *s.* 3) the railway has all the "rights and privileges" of the Land company.   The substantial question in the case concerns the rights of the Land company under Laws 1901, *c.* 251.

The act of 1901 was a legislative grant of corporate powers.   The fact that it was made to an existing corporation did not change its essential character.   A grant of power to act corporately in certain capacities confers corporate franchises.   The mere franchise to be a corporation, without specification of corporate powers, would be

something of a novelty. Whenever those powers are added to there is a new grant of corporate power, and this new grant is as much subject to legislative control as an original charter.

In answer to this it is urged that the provision as to tolls is in a true and complete sense a contract entered into by the legislature on behalf of the state, and secured against repudiation or alteration by the federal constitution.

In order to ascertain the real effect of the claim that the provision as to the schedule of rates was intended to be a contract, it is desirable to take account of the standing of the alleged parties thereto if that provision had been omitted from the act. There would then have been a grant of two well defined franchises, the right to build a bridge over public waters and authority to take tolls for passage over the bridge. The acceptance of these privileges would impose certain obligations upon the company. Undertaking in this way "a sort of public office" (*McDuffee* v. *Railroad*, 52 N. H. 430, 448) it would be bound to serve all and at equal and reasonable rates. On the other side the state would have the power to supervise the rates, and to keep them within the limits of reason. The claim made here is that this public duty to serve for reasonable compensation, and the correlative governmental right to compel such service, were abandoned by the legislature.

The mere statement of the situation which is claimed to have been created, discloses the reason for the uniform holding that no such surrender by the legislature will be implied. Its existence must be established beyond question. It must be certain to every intent, and a reasonable doubt is sufficient to defeat it. This universal rule has been fully endorsed in this state. *Dow* v. *Railroad*, 67 N. H. 1, 48.

The holding in *State* v. *Hayes*, 61 N. H. 264, and *Proprietors of Cornish Bridge* v. *Fitts*, 79 N. H. 253, that grants to corporations are to receive the same reasonable interpretation as other documents, in no wise conflicts with the rule stated above. The statement in the cases last cited was there applied in the interpretation of grants of rights to do certain acts in corporate form or to do acts of a semi-public nature which require consent of the state. The cases do not involve any surrender of the governmental power of the state. On the other hand the assertion of right in this case is a claim that the corporation was made superior to the law, and immune from the regulation ordinarily incident to the exercise of its "sort of public office." The difference is not in the rule for interpretation, but in the facts to be weighed as evidence of legislative intent. It is merely an applica-

tion of the general rule that the consequences of one interpretation or the other are to be considered in ascertaining the sense in which language is probably used. The fact that surrender of legislative power is in general so objectionable (*Dow* v. *Railroad*, 67 N. H. 1, 46, 47) is of so great weight that it is unreasonable to conclude there has been such abdication, except upon conclusive proof. The application of this theory in no way varies the fundamental rule for the ascertainment of the extent to which repealable rights are granted in charters. It is the existence in one case of a fact of paramount importance, and its absence in the other case, which leads to different results. In each case the conclusion is the more reasonable one in view of all the facts.

There is nothing in the language used by the legislature in this instance which in any way declares that the schedule of tolls is intended to be perpetual. The sole ground upon which it is claimed to be so is that a grant of property, or of a right, as to build the bridge or to take tolls, would be understood in that way. But because this is the reasonable and natural interpretation of a conceded grant of property or of rights which are not in derogation of government, it by no means follows that the same thought is expressed when what is said is open to dual interpretations one of which expresses the exercise of regulatory power while the other would declare an agreement to abdicate that governmental function. The choice then to be made is between grant and regulation. In this aspect of the case it is not a question of the extent and binding character of a granted right, but whether there is any grant at all. The argument from ordinary grants begs the question. Starting with the assertion that there is a grant of property, it assumed the vital issue.

The state having full regulatory power says to the utility you may make certain charges. It is going a long way to aver that such a provision is perpetual, and an abdication of future power to regulate. Without the claimed grant, the company would have had the right to charge and collect all reasonable tolls. Any subsequent change of rate by the state would be subject to that limitation. The effect of the allowance of the claim here made would be to protect the company in the extortion of unreasonable charges.

In view of these considerations it is evident that there is no proof beyond a reasonable doubt that the mere provision that the company "may demand, take and receive . . . tolls according to the following schedule" was a legislative grant of a perpetual right to continue such collection, without regard to the question of future reasonableness.

The argument that because rates were fixed as to the bridge, while as to sewer and water systems, authorized by the same act, the provision was that rates charged should be reasonable, therefore there was expressed an intent to settle the rate of bridge tolls permanently, is not a convincing one. The bridge was a project at once undertaken and completed; the sewer and water systems were more remote, and have never been constructed. Regarding all of them as subject to regulation of rates, it would not be unreasonable or unexpected to establish present rates for one while leaving the others in abeyance.

Again, it is argued that the state could protect the public from extortionate rates by chartering a competing bridge. The economic waste involved in such a proceeding is manifest. The net result would be that the public would be called upon to support two bridges, when only one was needed. It is not thought that such a remedy would so appeal to the legislators as to induce them to surrender the direct and efficient remedy which regulation of charges affords.

If the foregoing view of the nature of the provision fixing the rates for tolls is correct, there is as matter of course no question of the right of the state to make reasonable changes therein. This appears to be conceded. But if it were to be concluded that the provision was rather a grant of corporate power, other factors would require consideration. Foremost of these is the provision that the state has reserved the power to "alter, amend or repeal the charter of any corporation, or the law under which it was established, or may modify or amend any of its franchises, duties or liabilities" P. S., c. 148, s. 19, now P. L., c. 226, s. 12. This general law applied to any grant thought to have been made in 1901. It was as much a part of that grant as the sections then enacted. *State* v. *Railroad,* 69 N. H. 35; *Hoge* v. *Railroad,* 99 U. S. 348; *Greenwood* v. *Company,* 105 U. S. 13; *Lord* v. *Society,* 194 N. Y. 212.

The act of 1901 was passed in presumed accord with existing general law upon the subject-matter. Powers conferred by special acts are subject to general regulatory statutes, unless it is made to appear that there was an intent that they be exempted therefrom.

It has been suggested in argument that in the present state of our written law the reservation of the repealing power is incomplete and insufficient to reach the present situation. *Dow* v. *Railroad,* 67 N. H. 1 is relied upon to support this contention. It is said in that case (*p.* 53) that the reserved power to amend or repeal charters has been much misunderstood and misapplied. But there is no suggestion

that the power is non-existent. On the contrary, the thesis there maintained is that such power is embodied in the constitutional provision that "the supreme legislative power within this state, shall be vested in the senate and house of representatives" (Const. Pt. II, *art.* 2), that the legislature has no power to limit the full' exercise of authority by its successors, that the meaning of this constitutional provision is a matter of local law, as to which the federal court is bound to follow the local holding, and that consequently the power of amendment or repeal has always existed in this jurisdiction to its fullest extent.

Upon the foregoing view the statute reserving the right of repeal would be superfluous. But the opinion then goes on to consider the subject upon the generally accepted theory that a statutory reservation (as suggested by Judge *Story* in the *Dartmouth College* case) is necessary. Upon this phase of the matter no difficulty was found as to the sufficiency of the then existing statute. "The federal decision being neutralized by the reserved power of amendment and repeal, the rights of these parties are what they would have been if our decision of the federal question in the college case had been affirmed by the federal court." *Ib.*, 53, 54. The same conclusion was announced in *Opinion of the Justices*, 66 N. H. 629, 642.

The opinion then takes up the issue upon which the decision of the cause turned. The power of amendment or repeal does not include a right to compel the corporation to accept new powers. The provision of the general railroad law authorizing the lease of railroads, was enacted after the Northern Railroad was chartered. The attempt of the majority of the owners of the Northern to act under this general law was an undertaking to assume new powers, never accepted or agreed to by the minority, who were protected by federal law from this alteration of their contract with the other stockholders. While they were thus protected from legislative attempts to grant new powers, authority under the reserved power of amendment or repeal to take away existing powers was given the fullest recognition.

After considering the case of *Union Locks & Canals* v. *Towne*, 1 N. H. 44, it is said in the *Dow* case: "Neither in that case nor in this was a legislative reservation of a power of altering and repealing the original legislative grant necessary to enable the senate and house to make an additional grant of corporate power which the grantees could accept or refuse to accept. The meaning of such a reservation in a charter is an undisputed historic fact. Its only purpose and effect in the charter of the Northern Railroad is to enable the legislative

grantors to revoke, wholly or partially, conditionally or unconditionally, their grant of legal rights to that company; that is, to alter the grant in some other way than giving them more rights which they can accept or reject. The reservation enables the legislature to exercise the legislative power of revocation without the consent of the stockholders, and against their unanimous opposition." *Ib.*, 20.

The only form of amendment or repeal held to be objectionable in the *Dow* case is the grant of new powers. This the corporation may accept or reject at pleasure. But as to curtailment or rescission of franchises theretofore granted, the right is absolute. The only issue is one of legislative intent. This was the law of this state as to the scope and effect of the statute in force before the amendment of 1891.

Prior to 1891, the statutory reservation contained no specific reference to franchises. G. L., c. 147, s. 18. The phrase "or may modify or annul any of its franchises, duties or liabilities," was then inserted. P. S., c. 148, s. 19. The change was deemed to be a material one. Comm'rs Rep. P. S., c. 147, s. 19. Something was then understood to be added to the reservation theretofore made in the grant of corporate powers. Any franchises thereafter granted to any corporation was subject to this express provision.

The answer to the query, why any broadening of the statute was thought necessary in 1891, if the effect of the *Dow* case was as above stated, is found in the history of that decision. Although *Dow* v. *Railroad* was decided in 1887, the reasons for the decision were not made known until several years later. The brief memorandum accompanying the order in 1887 merely stated that the lease of the Northern railroad, under a legislative amendment to the general railroad law, was invalid as a fundamental change of the business of the corporation "to the making of which by corporate vote, not unanimous, under an exercise of the reserved power of amendment, the corporators did not assent when they accepted the charter." 67 N. H. 2. A part of the extended opinion was published in the fall of 1892, under the title "A New View of the Dartmouth College Case." 6 Harv. Law Rev. 161, 213. Other parts were published two years later. 8 *Ib.*, 295, 396. The opinion as it appears in 67 N. H. had not been completed by Judge *Doe* at the time of his death in 1896, and it was not published in the official reports until 1897 or 1898. It is not referred to in the discussion of the same questions in the *Opinion of the Justices*, 66 N. H. 629 (1891).

At the time the Public Statutes were being prepared by the commission and enacted by the legislature (1890 and 1891) all that was

publicly known of the grounds for the decision in the *Dow* case was to be found in the memorandum filed in 1887. The cause had been a notable one, and there was much speculation as to how far the decision went in limiting the effect of the statute (G. L., c. 147, s. 18) reserving the power to alter, amend or repeal charters. Viewed in the light of this history, the legislative purpose in adopting the change in this section recommended by the commission is not doubtful. The design was to make a clear declaration that the reserved power covered every aspect of corporate life and activity that constitutional limitations would permit.

It is evident that the legislation of 1891 was designed to remove any doubts as to legislative power to amend or repeal corporate franchises. It makes them in terms subject to that infirmity. Its potency is not modified, as suggested in argument, by the statement in *Rockingham &c. Light & Power Company* v. *Hobbs*, 72 N. H., 531, 538, that it "furnishes additional assurance that corporations engaged in the public service, as well as other corporations, shall perform their duties to the satisfaction of the public." The inquiry is at once suggested, how does the statute assure this? Manifestly by the sweeping power of control it reserves to the state. The limits of that control are not stated in that case. They are fully set forth in *Dow* v. *Railroad, supra,* and again in the *Opinion of the Justices,* 66 N. H. 629. In neither instance is there anything to suggest a lack of power to act in the present case.

The history of the development of our law upon this topic plainly discloses both a judicial holding that the power of repeal exists here in its broadest form, and a legislative purpose to make it plain beyond controversy that such is the situation. The opinion in the *Dow* case, and the amendment of the reserve statute in 1891, were but reaffirmations of the New Hampshire rule as to the power of repeal, stated at an earlier date. "The reserved power of amendment and repeal is not anything more than the legislature would have had without a reservation, if statutes of incorporation had been held to be possessed of the ordinary, amendable, and repealable quality of other statutes. With the reservation of that power, an act of incorporation, regarded as a grant, is an alterable and revocable grant, a gift or conveyance of something, a part or the whole of which the grantor can, without the grantee's consent, take back or destroy." The power is to revoke "that which, by legislation, the state had granted to it. Its existence, derived from the state, could be terminated by the state." *Ashuelot Railroad* v. *Elliot,* 58 N. H. 451, 454.

If the provision as to tolls were to be regarded as anything more than a determination of what tolls were presently reasonable, the alternative would be that it was the grant of a franchise, plainly repealable under the specific reservation contained in the general law. To say that instead of either of these interpretations of the language used the meaning is that the legislature thereby irrevocably agreed, on behalf of the state, that the company should have an indefeasible, perpetual right to exact unreasonable tolls, does violence to the canons of reasonable interpretation, and substitutes therefor a strained construction of the language, coupled with a disregard of the surrounding facts.

The construction contended for by the state leads to reasonable results, just to everyone. That asserted by the defendant clothes the company with power to mulct the public, in the exercise of a public franchise. This consideration alone would be a sufficient reason for adopting the position taken by the state.

The authority of the legislature to grant away the governmental power to regulate the charges of public utilities for their service to the public has been questioned (*Dow* v. *Railroad*, 67 N. H. 1, 46); but assuming that it exists, the foregoing rule that its exercise must be demonstrated to a certainty is not satisfied by the use of language of grant alone. There must be something beyond that, some language which in terms declares the intent to bind the state. This is wholly lacking in the present instance. In so far as the provision can be treated as a grant, it contains nothing out of the ordinary. There is an entire absence of any language tending to show a purpose to make the right granted an exception to the general law applicable to all grants not especially excepted from its provisions.

A quotation from *Greenwood* v. *Company*, 105 U. S. 13, in the *Opinion of the Justices*, 66 N. H. 629, 637, is relied upon to show that this schedule of tolls constituted a contract. It was there said: "Personal and real property acquired by the corporation during its lawful existence, rights of contract, or choses in action so acquired, and which do not, in their nature, depend upon the general powers conferred by the charter, are not destroyed by such a repeal." That the "rights of contract" there referred to do not include a right to take specific tolls, founded upon charter provisions, is evident when it is considered that the decision upheld a repeal of a charter to operate a railroad and take tolls. The phrase, rights of contract, there refers to rights acquired in the exercise of the corporate franchises. It does not imply that the franchises are themselves contracts exempt from the re-

served power of repeal. Carried to its legitimate conclusion, the argument advanced would make every legislative grant of a corporate franchise to do certain things an irrepealable contract; and that in the face of an express provision that all such grants are repealable.

The *Greenwood* case contains a flat denial of any such proposition. "Whatever power is dependent solely upon the grant of the charter, and which could not be exercised by unincorporated private persons under the general laws of the State, is abrogated by the repeal of the law which granted these special rights." *Ib.*, 18, 19.

The anomaly in the holding in the *Dartmouth College* case that a grant of a charter is a contract has a marked tendency to obscure the true issue in a case like the present. There is a tendency to look only to the granting feature of the legislative act, to treat that as the whole transaction, and to overlook the provision in the general law that all such so-called contracts are now subject to cancellation at the will of the state. If there is a contract, the reservation is as much a part of it as the grant. The two are not separate and independent acts of the state but inseparable parts of one transaction.

As has been said of another limiting feature of charters: "The general law and the charter imposed on the defendants no duty which they did not directly and voluntarily assume. They presented to the defendants a proposition which they were at liberty to accept or to reject. The defendants accepted the charter subject to the burdens by it imposed." *State v. Railroad,* 69 N. H. 35, 49.

The conclusion arrived at is that the provision in the act of 1901 was a mere regulation of the tolls to be charged, and that if it could be construed as a grant of right it was a franchise, repealable under the reserved power of the state. It was not an irrepealable contract entered into on behalf of the state.

But it is said that the question being whether the action of the state in undertaking to presently regulate the tolls would violate rights secured by the federal constitution, the general question, what rights were conferred upon the company, becomes one of federal law and the federal view must be adopted. It is not necessary to consider whether in a situation like this it is our duty to follow the federal decisions when they are opposed to our own view upon questions of general law or the interpretation of our local constitution and statutes. As the federal cases are understood, they fully sustain the conclusions hereinbefore stated.

The rule that a contract like that here claimed by the defendant must be proved beyond a doubt has been declared by the federal

court in many cases and with no dissent. *Railroad Commission* v. *Railway*, 280 U. S. 145, and cases there cited and reviewed.

So too it has been uniformly held that mere language of grant is not sufficient to satisfy the calls of the rule. The holdings are, in substance, that some statement of agreement must appear, or that if the existence of the same is inferred the inference must be a necessary one. As was said of a legislative grant to a municipality, "If inferred from other powers, it is not enough that the power is convenient to other powers; it must be indispensable to them." *Freeport Water Co.* v. *Freeport*, 180 U. S. 587, 598.

The question has most frequently arisen in litigation over the acts of municipalities, where one issue was whether the legislature had conferred upon the municipality mere authority to fix rates or the broader power to enter into a contract fixing rates. The cases uniformly follow the rule that express language must be used to confer the latter power. *Railroad Commission* v. *Railway, supra.*

The terms of the acts which have been held to grant municipal power to contract are instructive. In *Detroit* v. *Railway*, 184 U. S. 368, 385, 386, the provision was that rates should be established "by agreement between the company and the corporate authorities of the city or village." "It was made matter of agreement by the express command of the legislature." In *Cleveland* v. *Railway*, 194 U. S. 517, 534, 536, the city was given power "to fix the terms and conditions upon which such railways may be constructed, operated," etc., and a written acceptance of the terms prescribed was required. *Columbus &c. Company* v. *Columbus*, 249 U. S. 399, arose under the same statutes, and was decided the same way. In *Minneapolis* v. *Railway*, 215 U. S. 417, the city undertook to fix fares by an ordinance, providing for acceptance by the railway, and that when accepted the ordinance should "operate as a contract between the city and said company." Subsequently the legislature passed a legalizing and confirming act.

On the other hand it is held that mere authority to grant does not confer power to agree. *Milwaukee Electric Railway* v. *Commission*, 153 Wis. 592; affirmed, 238 U. S. 174. Where the act "authorizes command, but not agreement," there is no power to make a contract. *Home Telephone &c. Co.* v. *Los Angeles*, 211 U. S. 265. And where power to contract has been conferred, it must clearly appear that the action taken was designed to be contractual. Fixing a schedule of rates which the grantee "shall charge" is not enough. *Rogers Park Water Co.* v. *Fergus*, 180 U. S. 624.

As to legislative dealings directly with the corporation, as by granting a charter, it has been determined that language granting authority to take certain tolls "cannot properly be construed as a promise or pledge that the limitation as to rates may not be altered at any time when, in the judgment of the legislature, it may be proper so to do." *Stanislaus County* v. *Company*, 192 U. S. 201, 207.

Upon the final proposition upon this branch of the case—the reserved right of repeal—the case last cited appears to be decisive upon the question of violation of rights secured by the federal constitution. It was there held in terms that if the grant of rates were to be held to be a contract binding upon the state, still the rates could be changed under the reserved power. While acknowledging the exercise of that power in such a situation is not without limitation and that confiscatory rates could not be imposed, yet "a mere reduction of rates, while still leaving reasonably fair, or just compensation for the use of the property, is not prohibited, and we are quite clear that, even assuming there was a contract, the legislature nevertheless had the power to so alter and amend the act of 1862 as to provide for the fixing of rates as set forth in the act of 1885." *Ib.*, 213.

Whether the issue be disposed of under federal law or local law, the result is the same. The company did not take an irrepealable right to charge the tolls set forth in the schedule contained in the act of 1901.

II. The establishment of the public service commission (Laws 1911, *c.* 164) marked a broad change in state policy as to the control of public utilities. The whole subject was in large measure committed to the commission. *Parker-Young Co.* v. *State*, 83 N. H. 551, and cases cited. There is no reasonable doubt that the legislative purpose was to give the commission full control over the rates to be charged, save in a few specifically excepted instances, where power to increase certain statutory rates was withheld.

Subject to these exceptions, the commission was clothed with the state's power to act. The statute has heretofore been construed to have this effect. It superseded a provision in a charter fixing a schedule of rates, with a reserved right of alteration by the court. *Proprietors of Cornish Bridge* v. *Fitts*, 79 N. H. 253. This interpretation of the statute has been approved in the subsequent reënactment thereof without substantial change. P. L., *cc.* 236-242. The statute was intended to apply to this utility.

No sufficient reason has been advanced for denying the legislative power to exercise the reserved right to amend specific franchises by legislation of a general character. It all comes to a question whether

there has been adequate expression of intention. If that is found to exist, special grants, as well as general ones, are modified accordingly.

The repeal of special acts by later general legislation upon the same subject received elaborate consideration in the *Opinion of the Justices*, 66 N. H. 629, 661-674. It would be superfluous to attempt any addition to what was there said. The reasoning leads directly and definitely to the conclusion that the act of 1911 was intended to be applied to all toll bridges. Any repealable special provision as to rates of toll was so far abolished thereby that all tolls were made subject to revision upon proceedings before the commission.

It is argued that the language of the act establishing the commission (Laws 1911, *c.* 164, *s.* 11, (a) and (c) ) manifests an intent to exclude the present situation from the jurisdiction conferred. Section 11 (a) deals with railroad rates and contains the proviso that "the commission shall not allow an increase above any rate prescribed or limited by statute." Section 11 (c) deals with public service rates and contains no such limitation. By amendment, this limitation was made applicable to both classes of cases. Laws 1913, *c.* 145, *s.* 10. The claim is that this reservation shows a legislative understanding that rates which had theretofore been fixed by the legislature were not to be changed by the commission. We do not so understand the purport of this proviso. It rather signifies a legislative understanding that jurisdiction over all rates was conferred; and that if any were to be excepted a specification thereof was essential. The original exception prohibited an increase of railroad rates above statutory limits theretofore existing. Had there been an understanding that this and other provisions of the act excluded jurisdiction over public service rates, theretofore established by the legislature, there would have been no occasion for the enactment of the amendment of 1913. The adoption thereof demonstrates that the legislature understood that full jurisdiction over statutory public service rates had been conferred in 1911, and that if power to increase such rates in certain cases was to be denied express legislation to that end must be enacted.

Some other arguments urged as showing a legislative understanding that this particular utility was exempt from the provisions of the general law, and that amendments thereto were not intended to apply to it, remain to be considered. The railway to which the bridge was sold by the Granite State Land company is a Massachusetts corporation; and it is argued that its franchises were not subject to repeal or amendment by the New Hampshire legislature and that therefore when that legislature authorized the transfer to this foreign corpora-

508

tion of local franchises it must have understood that the same were irrepealable; that if it had understood otherwise it would not have thus granted away existing rights of control.

It is not necessary to consider how far a foreign corporation, taking by legislative permission the exercise of local franchises theretofore granted to a local corporation, is bound by the state's reservation of the power to repeal the same franchises. The act providing a method whereby the tolls over this bridge might be regulated was passed while the bridge was still the property of the New Hampshire corporation. The public service commission was established in 1911, while the act authorizing the sale and transfer of the bridge was not passed until 1913. The purchaser under the latter act took the title and rights of the Land company, and no more. The right to take tolls being then subject to revision as to rates by the commission, it remained so in the hands of the purchaser.

There was no error in the ruling denying the motion to dismiss the petition.

*Appeal dismissed.*

All concurred.