Public Utilities Commission
No. 7810

### LEGISLATIVE UTILITY CONSUMERS' COUNCIL
### AND
### VOLUNTEERS ORGANIZED IN COMMUNITY EDUCATION

### v.

### PUBLIC UTILITIES COMMISSION
### THE STATE OF NEW HAMPSHIRE
### AND
### PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE

February 17, 1978

94

*Steven W. Ruback,* of Concord, by brief and orally, for the Legislative Utility Consumers' Council.

*Peter W. Brown,* of Concord, by brief and orally, for the Volunteers Organized in Community Education.

*Dom S. D'Ambruoso* and *Warren E. Waters,* of Concord (*Mr. Waters* orally), for the Public Utilities Commission.

*Sulloway, Hollis, Godfrey & Soden,* of Concord (*Martin L. Gross* orally), for Public Service Company of New Hampshire.

BOIS, J.   This is an appeal under RSA 541:6 from an order of the Public Utilities Commission [commission] denying certain refund claims made by the Legislative Utility Consumers' Council [LUCC] and Volunteers Organized in Community Education [VOICE]. The refund claims were asserted by the plaintiffs, as intervenors, against the Public Service Company of New Hampshire [PSC] in the course of monthly fuel adjustment rate hearings authorized by RSA 378:3-a II (Supp. 1976). These claims and a motion for a rehearing, subsequently filed, were denied by the commission. For the reasons which follow herein, we uphold the decisions of the commission and dismiss the appeal.

PSC has a fuel adjustment clause as part of its tariff, which operates to recover fossil fuel costs which exceed fuel costs included in the basic rates. For PSC the fuel adjustment charge represents the increased cost of fossil fuel over what those costs were in mid-1971. Included within the calculation of the monthly fuel adjustment charge is the cost of coal which is eventually passed on to and paid for by consumers. *Legislative Utility Consumers' Council v. PUC,* 117 N.H. 972, 380 A.2d 1083 (1977).

PSC has a coal contract with Consolidation Coal Company [CCC] which provides in part that CCC will maintain a storage pile and that the total monthly price will equal the appropriate unit contract price multiplied by the tons bunkered by PSC.

In 1971 the storage pile was reduced to zero. CCC then began rebuilding a coal reserve for PSC. In 1975 it was discovered that more than 100,000 tons of coal had been paid for but not bunkered. Thus PSC had recorded on its inventory and paid CCC for more coal than it actually burned. The cost of this coal had been included in the monthly fuel adjustment charges, passed on to and paid for by the consumers, so a refund was in order. Three independent surveys of the coal pile, ordered by PSC and CCC, differed by a small amount and a settlement figure of 127,209.60 tons was agreed to.

When the commission was informed of the discrepancy, a conference was held on August 30, 1976, to discuss the manner in which the overcharges would be returned to PSC's customers. The

precise times when the discrepancy was built up could not be established. It was proposed that the buildup be assumed to have occurred from November 1971 to August 1976. If it were further assumed to have occurred equally in each of those months, then the built-up tons should be priced out at the cost of coal during those months. Being unable, however, to establish the buildup in each month, and because of the constantly escalating price, PSC decided to price out the refundable coal at the current, higher price of $34.03 per ton. It was computed that pricing the coal out at the actual increasing prices over the five-year period would yield a refund of about $2.5 million, as opposed to $4.5 million based on the current price. CCC agreed to make its refund on the current rather than the historical cost of the coal.

Matters concerning the coal pile inventory discrepancy were raised at monthly fuel adjustment charge hearings held from August 20, 1976, to January 18, 1977. These monthly hearings, open to the public, were held pursuant to RSA 378:3-A II (Supp. 1976), requiring commission approval before a utility levies a fuel adjustment charge. LUCC (joined by VOICE), intervened pursuant to RSA 363-C:8 III (Supp. 1976), empowering LUCC to "intervene in, any proceeding before any . . . regulatory body in which the interests of utility consumers are involved . . . ." In addition to inquiring about the coal buildup, the plaintiffs raised questions concerning the quality of contract coal and the reasonableness of PSC's purchases of noncontract coal during the inventory buildup. They eventually sought the following refunds:

(a) a BTU deficiency adjustment;

(b) a refund for transportation costs associated with BTU deficient coal;

(c) a refund for purchases for noncontract coal above the contract price; and

(d) interest on refunds (a), (b), and (c) as well as on the coal inventory refund.

Additional claims were raised and denied but have not been appealed. PSC agreed to distribute a refund based on deficiency in BTU content of some of the coal it purchased as well as its transportation costs. It refused, however, to distribute interest on these two refunds and refused the other refunds requested by the intervenors.

On April 7, 1977, the commission denied the remaining claims. Even though the contract with CCC was a requirements contract and further required CCC to maintain a 45-day stockpile of coal as a reserve, the commission sustained PSC's purchase of noncontract coal. The ruling was based on the commission's findings that (1) the Arab oil embargo of 1973 had a substantial effect upon PSC's decisions to purchase noncontract coal; (2) the company properly wanted to test the coal market, from time to time, realizing that the contract with CCC would soon expire; and (3) PSC was not satisfied with its supplier's ability to maintain a coal reserve sufficient to hedge against such anticipated interruptions as railroad delivery problems, coal miners' strikes, and holidays. Interest was denied because "PSC did not obtain an interest element in its settlement with CCC and thus has no funds which belong to its customers."

On April 26, 1977, the intervenors moved for a rehearing, alleging the denial of their claims was "clearly unlawful or unreasonable." They also argued that the commission erred in denying refunds on the spot purchases of coal based on the consideration of the effect of the Arab oil embargo, "when there is no evidence in the record concerning the same." The motion was denied. Intervenors thereupon filed an appeal to this court under RSA 541:6 contesting the denial of their claims as well as of their motion for a rehearing.

The first question is whether the commission had the statutory authority to pass on the claims raised by LUCC and VOICE. PSC argues that the refunds sought by the intervenors were "reparations" and recoverable only by a proceeding pursuant to RSA 365:29. That statute provides that:

> Whenever complaint has been made to the commission covering any rate, fare, charge or price demanded and collected by any public utility, and the commission has found, after hearing and investigation, that an illegal or unjustly discriminatory rate, fare, charge or price has been collected for any service, the commission may order the public utility which has collected the same to make due reparation to the person who has paid the same, with interest from the date of the payment. Such order for reparation shall cover only payments made within two years before the date of filing the petition for reparation.

The intervenors did not initiate a reparation claim proceeding, so the company asserts that their claims should never have been heard.

PSC had filed a motion with the commission at the hearing, seeking to limit the scope of inquiry to the question of how the coal adjustment refund was to be passed on to the consumers. In its April 7 report the commission denied this motion and stated that it undertook "a close continuing surveillance of this entire matter" because it decided that "the legislative intent of RSA 378:3-a [(Supp. 1976), requiring review of fuel adjustment charges] required full and complete inquiry . . . ."

We note that, under RSA 365:8, "[t]he commission shall have power to adopt and publish rules to govern its proceedings, and to regulate the mode and manner of all investigations and hearings before it . . . ." Additionally, pursuant to RSA 365:5, "[t]he commission of its own motion or upon petition of a public utility may investigate or make inquiry in a manner to be determined by it as to any rate charged or proposed or as to any act or thing done, or omitted to be done or proposed by any public utility . . . ." Cf. *Granite State Gas Transmission, Inc. v. State*, 105 N.H. 454, 202 A.2d 236 (1964) (commission may order a refund under RSA 365:29 on its own motion). Thus, it may not have been improper for the commission to consolidate its hearing on the coal adjustment refund with hearings on the additional claims made by the intervenors. Also, it appears that the PSC received adequate notice of the additional claims, which it argues is what the reparation-petition requirement is designed to insure. At any rate, since we hold today that the additional claims asserted by the intervenors were properly denied, we need not resolve the procedural question posed by the PSC.

We next consider the intervenors' argument that the denial of the refund claim for purchases of noncontract coal in excess of the contract price was erroneous.

■ "RSA 541:13 (1974) provides the standard for review of the commission's orders by this court. It provides that 'all findings . . . upon all questions of fact properly before it shall be deemed to be prima facie lawful and reasonable; and the order or decision appealed from shall not be set aside or vacated except for errors of law, unless the court is satisfied, by a clear preponderance of the evidence before it, that such order is unjust or unreasonable.'" *Concord v. Water Supply Comm'n*, 115 N.H. 614, 615, 347

A.2d 173, 174 (1975); *Legislative Utility Consumers' Council v. PUC,* 117 N.H. 972, 380 A.2d 1083 (1977). We have held that the presumption of lawfulness and reasonableness can be overcome by a showing that no evidence was presented to sustain the order. *See Lambert Constr. Co. Inc., v. State,* 115 N.H. 516, 345 A.2d 396 (1975); *N.H.-Vt. Hosp. Serv. v. Whaland,* 114 N.H. 92, 315 A.2d 191 (1974).

On the record before us, we cannot say that these standards are met in the instant case. The commission found that the PSC made noncontract purchases in part because it wanted to test and sample the coal available from other suppliers, and in part because of its fears that interruptions in delivery would deplete the coal reserves. Although these fears may have been based partly on faulty estimates of the magnitude of the stockpile, they were not found by the commission to have been so unreasonable as to constitute mismanagement. *See Legislative Utility Consumers' Council v. PUC supra.*

" 'We do not sit as a trier of fact in these matters.' " *O'Loughlin v. State Personnel Comm'n,* 117 N.H. 999, 380 A.2d 1094 (1977). We cannot say the commission's finding, that the purchase of noncontract coal was justifiable, was unjust or unreasonable by a clear preponderance of the evidence.

We have previously noted that the agreement between PSC and CCC was a requirements contract. Nothing contained herein should be construed as affecting or determining any contractual rights or obligations of the parties. *See* PSC of N.H., Docket No. ER 76-285 Phase II (FERC December 9, 1977).

We do find error in the official or judicial notice taken by the commission of the effect of the Arab oil embargo. The decision stated that "[t]he enormous uncertainty which befell the entire U.S. during the Arab oil embargo had a substantial effect upon the management decisions at PSC to purchase ex-contract coal." It elaborated on the embargo, then concluded that "[a]gainst the backdrop of the critical fuel supply situation starting in the fall of 1973 the company's efforts to build up its stockpile of coal to amounts beyond 45 days would appear to be a logical and prudent management decision to protect its customers against possible hardships of curtailed power use." Yet, the commission heard no testimony on the effect, if any, of the embargo on the PSC's ac-

tions, and when LUCC and VOICE sought an opportunity to rebut the assumption that it had an effect, their motion was denied.

"While there is authority for the proposition that judicial notice should be conclusive (Morgan, *Judicial Notice*, 57 Harv. L. Rev. 269), fairness in trial practice demands that the opposing party have an opportunity to dispute it." *State v. Duranleau*, 99 N.H. 30, 32, 104 A.2d 519, 521 (1954); *accord, Paras v. City of Portsmouth*, 115 N.H. 63, 335 A.2d 304 (1975); *State v. Miller*, 102 N.H. 260, 154 A.2d 699 (1959). In *Insurance Services Office v. Whaland*, 117 N.H. 712, 378 A.2d 743 (1977), the commissioner rejected a requested rate increase partly in reliance on information not contained within the record. We held that the notice taken was proper since "[i]n this instance, plaintiff was granted a rehearing and had a full opportunity to rebut any evidence upon which the commissioner relied." *Id.* at 712, 378 A.2d at 748. In the case presently before us, the intervenors did not know that official notice would be taken until the commission rendered its decision. The commission did not merely take notice of a fact of common knowledge but went further and found that the embargo had an effect on coal mines; on CCC; on PSC purchases from CCC; and that it may have required spot purchases of coal. Such notice goes beyond the ambit of commonly known facts. When the intervenors sought a rehearing to rebut the evidence, their motion was improperly denied. *Ohio Bell Tel. Co. v. PUC of Ohio*, 301 U.S. 292 (1937); 2 K. C. Davis, Administrative Law §§ 15.08–15.10 (1958); 2 Am. Jur. 2d *Administrative Law* §§ 385, 386, 444, 445 (1962); Annot., 18 A.L.R.2d 552, § 8 (1951).

The company argues that the intervenors are foreclosed from disputing the noticed facts because of a passing reference contained in the brief filed by VOICE with the commission after hearing but before decision. VOICE referred to the embargo in a passage describing the history of fuel adjustment charges; it stated that "until the escalating fuel prices of the late 60's and the Arab oil Embargo of 1973 they were viewed by many regulatory bodies with suspicion." This statement does not amount to a concession that the Arab oil embargo required the PSC to purchase noncontract coal nor does it permit speculation as to what effect, if any, it might have had on the coal market.

■ However, the commission also concluded that, in addition to the embargo, the uncertainty surrounding CCC's ability to continue shipping an adequate supply of coal "would be sufficient to justify ex-contract purchases by PSC." Testing of the spot market, from time to time, as well as evidence of instances of "force majeures" interfering with the delivery of coal also entered into the commission's deliberations. The findings that these were independent and adequate grounds warranting such purchases are not as a matter of law erroneous. We cannot say that it was unreasonable for the commission to find that these actions by PSC did not constitute mismanagement. We therefore hold that, because of these additional findings made by the commission, the taking of official notice of the embargo was harmless error and the denial of the refund claim is affirmed.

The final question is whether the denial of the refund claims for interest was improper. It is conceded that PSC itself received no interest from CCC. The company attempts to justify its decision not to seek interest on the grounds that litigation would be time consuming and would thus delay disbursement of the refunds which CCC was willing to grant, and that the favorable refund rate made up for any interest that might be collected through legal proceedings.

The commission found that PSC had in fact "not been unjustly enriched at the expense of its customers"; that the pricing out of the coal pile at current rather than historical costs "more than compensates . . . for the time value of any money overpaid . . . ."; and that "[t]he computation by intervenors has not been made from the date customers actually pay their bills and, thus, there is no accurate information in the record upon which to ascertain what interest might be due. . . . The method of calculating a proper interest would be an administrative nightmare employing additional aid at additional cost."

■ The finding that the failure to obtain an interest refund did not constitute mismanagement was not unreasonable. The company's decision not to incur the expenses, risks, and delays of litigation seems a legitimate exercise of managerial discretion in light of the favorable settlement obtained. *But cf. West Ohio Gas Co. v. PUC of Ohio* (No. 1), 294 U.S. 63, 68 (1935) ("[a] public utility will not be permitted to include negligent or wasteful losses among

its operating charges"); *PSC v. State,* 113 N.H. 497, 501, 311 A.2d 513, 516 (1973). We therefore find the denial of the intervenors' claims not to be unjust or unreasonable.

*Appeal dismissed.*

LAMPRON, J., did not sit; FLYNN and CANN, JJ., sat by special assignment pursuant to RSA 490:3; all concurred.