Public Utilities Commission
No. 78-020
No. 78-173

LEGISLATIVE UTILITY CONSUMERS' COUNCIL

v.

PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE & a.

May 17, 1979

*J. Michael Love,* of Manchester, by brief and orally, for the Legislative Utility Consumers' Council.

*Cleveland, Waters & Bass,* of Concord, and *D'Ambruoso & Carroll,* of Concord (*Robert T. Clark* orally), for the Public Utilities Commission.

*Sulloway, Hollis, Godfrey & Soden,* of Concord (*Martin L. Gross* orally), for Public Service Company of New Hampshire.

BOIS, J. This is an appeal brought pursuant to RSA 541:6 from order No. 13,162 entered on May 25, 1978, by the public utilities commission (commission) following its investigation under RSA 378:5 of a proposed tariff charge filed by Public Service Company of New Hampshire (company) on April 27, 1977. The Legislative Utility Consumers' Council (LUCC), as authorized by RSA 363-C:8 III (Supp. 1977), appeared as an intervenor during the proceedings before the commission. Following the commission's order granting an annual revenue increase to the company of $30,134,232, calculated upon a rate base of $478,833,421 that included Construction Work In Progress (CWIP) of $111,258,428, the LUCC brought this appeal.

The LUCC raises several substantive and procedural issues for our review. The main focus of the LUCC's appeal challenges the legality of the commission's inclusion in the company's rate base of its CWIP, which arises primarily as the result of the construction of a nuclear powered generating plant at Seabrook. A utility company involved in such a construction program must raise capital to finance it. The utility company accomplishes its task by issuing debt obligations, borrowing money, and selling equity securities such as common and preferred stock. Raising capital costs money because interest must be paid on debt and dividends must be paid to stockholders. The dollars expended by the company for these purposes represent the "cost of money." It is this "cost of money" that is CWIP. Mattutat, *A Pragmatic Approach to Construction Work In Progress,* 99 Pub. Util. Fortnightly 31 (March 3, 1977).

CWIP traditionally has been capitalized in an Allowance For Funds Used During Construction (AFUDC) account and added to the utili-

ty's rate base after the plant under construction begins actual service. Under the AFUDC approach, the utility spreads the recovery of its CWIP over the useful life of the completed facility and is not allowed to recover it as it is incurred. In the present case, the commission rejected the AFUDC approach which defers recovery of CWIP, and included CWIP in the current rate base. The company receives a present rate of return on its CWIP, thereby recovering it as it is incurred without having to wait until the plant under construction comes on line.

The LUCC argues that the commission's inclusion of CWIP in the company's rate base violates the "used and useful in the public service" principle of public utility regulation, RSA 378:27, :28, and also the "just and reasonable" requirement of RSA 378:7 and :28. The LUCC challenges not only the ultimate legality of the inclusion of CWIP in the rate base, but also the methodology and procedures employed by the commission in reaching its decision. In this comprehensive appeal, the LUCC also asks us to rule that the commission exceeded its statutory authority or misapplied the law in three other areas. The LUCC argues that the commission erred in adopting certain test year methodologies, in authorizing an annual revenue increase in excess of that requested by the company in its filed tariff, and finally by including materials and supplies associated only with nonutility operations in the rate base.

The company, engaged in both the retail and wholesale sale of electricity in New Hampshire, requested a $27,017,520 annual revenue increase from the commission in its April 27, 1977, tariff proposal to become effective on June 1, 1977. By order No. 12,732, the commission suspended the implementation of the proposed revenue increase, RSA 378:6, pending investigation and public hearings, RSA 378:5, on this matter of vital public concern.

On May 2, 1977, the commission issued an order of notice announcing that a hearing would be scheduled for June 1, 1977, for the purpose of determining the procedures to be followed during the commission's hearing on the merits of the company's proposal. The LUCC and other intervenors appeared at this hearing and participated in the discussion. The commission issued its procedural order No. 12,803 on June 17, 1977.

The commission issued a further order of notice on September 16, 1977. The order scheduled hearings on the merits to commence on October 11, 1977. Twenty-two days of hearings were conducted and eight public informational meetings were held in major New Hampshire cities. Because of the complexity of the issues involved, the vol-

ume of data presented, and the extensiveness of the hearings, the commission did not reach a decision within the statutory six-month period and the company placed its proposed rates into effect under bond on December 3, 1977. RSA 378:6. *See Nelson v. Pub. Serv. Co.*, 119 N.H. 327, 402 A.2d 623 (1979).

The company, the commission, and the intervenors all presented expert witnesses at the hearings. The LUCC and the company filed briefs with the commission. Attorneys for the LUCC and the company, as well as the commission's counsel, engaged in extensive cross-examination of the expert witnesses. Contested issues ranged across the entire spectrum of public utilities regulations, including the questions of allowable operating costs, content of the rate base, fair rate of return, amount of annual revenue increase required, and the proper allocation of revenue increase among the State's retail consumers of electricity. The company asked the commission to approve an annual revenue increase of $31,977,602 even though it never formally amended its filed tariff which had requested nearly five million dollars less. The company argued for the inclusion of $111,258,428 of CWIP in its rate base and the cessation of the AFUDC treatment of CWIP. The company supported inclusion of CWIP in the rate base by asserting that completion of the construction of the Seabrook nuclear powered generating plant, of which the company was then fifty percent stockholder, would be seriously jeopardized unless it was provided with current revenue to satisfy investors and creditors instead of being allowed to accumulate a large AFUDC account to be included in the rate base only after the Seabrook plant went on line. The LUCC countered the company's presentation by arguing that including CWIP in the current rate base is illegal under existing statutory law and further arguing that the facts did not warrant the company's assertion that its Seabrook construction program would be threatened without the inclusion of CWIP in the rate base.

In its decision and final report, the commission made findings on questions of fact properly before it, all of which we must regard as "prima facie lawful and reasonable." RSA 541:13. The LUCC's appeal challenges the legality of the order and the validity of many of the commission findings, and asks that we conclude that "a clear preponderance of the evidence" before us demonstrates that the commission's rulings and order were "unjust or unreasonable." RSA 541:13.

Subsequent to oral argument, we ordered the parties to submit supplemental briefs addressed to whether the commission's order to include CWIP in rate base involved rulemaking or only its adjudica-

tive function. We find that no commission rule has ever existed controlling this issue and we undertake our review as we would in any traditional appeal from an adjudicative order of an administrative agency. *See* 2 F. COOPER, STATE ADMINISTRATIVE LAW 663 *et seq.*

I

## The Role of the Commission

During the past several years, the issues involved in the ratemaking process of energy producing public utility companies have assumed unprecedented significance and visibility. *See* Amyot, *Electric and Gas Rates—The Current Consumer Battleground*, 17 N.H.B.J. 247 (1976) (hereinafter cited as Amyot). The legislature's creation of the LUCC indicates the public's heightened awareness of the importance of utility ratemaking. *See* RSA ch. 363-C (Supp. 1977).

The statutory authority to set public utility rates in this State has long existed exclusively in the public utilities commission. RSA ch. 378. "The commission has broad discretion to act in the public interest." *Browning-Ferris Industries, Inc. v. State*, 115 N.H. 190, 191, 339 A.2d 1, 3 (1975). Ratemaking is "a complex, esoteric area" and "the Commission has been entrusted with the difficult task of deciding among many competing arguments and policies" in reaching decisions that serve the public interest. *Goodman v. Pub. Serv. Comm'n*, 497 F.2d 661, 665–66 (D.C. Cir. 1974); *accord, Legislative Util. Consumers' Council v. Pub. Util. Comm'n*, 117 N.H. 972, 974, 380 A.2d 1083, 1084 (1977); *New England Tel. & Tel. Co. v. State*, 113 N.H. 92, 95, 302 A.2d 814, 817 (1973); *United Tel. Co. v. State Commerce Comm'n*, 257 N.W.2d 466, 481 (Iowa 1977). The commission has been assigned a difficult chore; it is responsible for evaluating and reconciling conflicting and complicated evidence and testimony. Amyot, *supra* at 258.

Because ratemaking "involves a highly technical and complicated process calling for an expertise which frequently taxes the experience and knowledge of the members of the [Commission]," *Spintman v. Chesapeake & Potomac Tel. Co.*, 254 Md. 423, 429, 255 A.2d 304, 307 (1969), we have held that whether the commission bases its decision on the testimony of one expert instead of another, or on its own staff testimony, "is a matter for its judgment based upon the evidence presented." *New England Tel. & Tel. Co. v. State*, 113 N.H. 92, 102, 302 A.2d 814, 821 (1973); *see City of Concord v. Water Supply & Pollution Control Comm'n*, 115 N.H. 614, 615–16, 347 A.2d 173, 174 (1975). We acknowledge that "[t]he Commission must exercise its own expertise and skill in the setting of rates," *New England Tel. & Tel. Co.*

*v. Pub. Util. Comm'n,* 390 A.2d 8, 30 (Me. 1978), and recognize that "[t]he soundness of having [ratemaking] matters . . . determined by a commission of persons qualified to evaluate the issues in a specialized field lies beyond dispute." *Spintman v. Chesapeake & Potomac Tel. Co.,* 254 Md. 423, 429, 255 A.2d 304, 307 (1969).

## II

### *The Standard of Review*

It is well settled that this court does not sit as a trier of fact in appeals from the commission. *Legislative Util. Consumers' Council v. Pub. Util. Comm'n,* 118 N.H. 93, 99, 383 A.2d 89, 92 (1978). The legislature has established the parameters for our inquiry in performing our review of commission orders under RSA 541:13:

> *Burden of Proof.* . . . [A]ll findings of the commission upon all questions of fact properly before it shall be deemed to be prima facie lawful and reasonable; and the order or decision appealed from shall not be set aside or vacated except for errors of law, unless the court is satisfied, by a clear preponderance of the evidence before it, that such order is unjust or unreasonable.

This court does not engage in factfinding or policymaking when reviewing ratemaking orders of the commission. Those are functions that have been appropriately delegated to the commission by the legislature. RSA ch. 378. Even when we are persuaded that we might have reached a contrary result had we been in the commission's role as trier of fact, we will not reverse the commission's order unless it is unlawful, unjust, or unreasonable or reflects an abuse of commission discretion. *Shevin v. Yarborough,* 274 So. 2d 505, 510 (Fla. 1973). *Cf. Melton v. Personnel Comm'n,* 119 N.H. 272, 401 A.2d 1060 (1979) (upholding personnel commission decision in promotion dispute).

We have frequently enunciated our recognition of the narrowness of our scope of review of commission orders. The ultimate issue before this court on appeal is whether the party seeking to set aside the decision of the commission has demonstrated by a clear preponderance of the evidence that such order is contrary to law, unjust, or unreasonable. *New England Tel. & Tel. Co. v. State,* 104 N.H. 229, 233, 183 A.2d 237, 240–41 (1962), *quoting* RSA 541:13, *citing Pub. Serv. Co. v. State,* 102 N.H. 150, 162, 153 A.2d 801, 810 (1959); *accord, Legislative Util. Consumers' Council v. Pub. Util. Comm'n,* 117 N.H. 972, 974, 380 A.2d 1083, 1084 (1977); *Windham Estates Ass'n v. State,* 117 N.H. 419, 426, 374 A.2d 645, 650 (1977). We have adhered to

the "end result" test established by the United States Supreme Court in *Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944) for appellate review of agency ratemaking orders. *New England Tel. & Tel. Co. v. State*, 104 N.H. 229, 241, 183 A.2d 237, 245 (1962); *New England Tel. & Tel. Co. v. State*, 95 N.H. 353, 361, 64 A.2d 9, 16 (1949). "The ultimate test of the Commission's decision is whether on the evidence before it the Commission was warranted in concluding that the rates were 'just and reasonable.'" *Granite State Alarm, Inc. v. New England Tel. & Tel. Co.*, 111 N.H. 235, 239, 279 A.2d 595, 598–99 (1971); *see, e.g., New England Tel. & Tel. Co. v. State*, 104 N.H. 229, 232, 183 A.2d 237, 240 (1962). The commission is nevertheless under an obligation to set forth its methodology and findings fully and accurately in order that this court may undertake meaningful judicial review of its methods, findings, and order. *See New England Tel. & Tel. Co. v. State*, 113 N.H. 92, 95, 302 A.2d 814, 817 (1973); *New England Tel. & Tel. Co. v. State*, 95 N.H. 353, 357, 64 A.2d 9, 14 (1949).

 This State's statutory mandate is that rates determined by the commission for a public utility "shall be sufficient to yield not less than a reasonable return on the cost of the property of the utility used and useful in the public service less accrued depreciation." RSA 378:27. The public utility is further entitled to "a just and reasonable rate base and a just and reasonable rate of return thereon." RSA 378:28; *see Pub. Serv. Co. v. State*, 113 N.H. 497, 508, 311 A.2d 513, 520 (1973). The statutory scheme dictates that the commission's ratemaking power "is plenary save in a few specifically excepted instances." *State v. New England Tel. & Tel. Co.*, 103 N.H. 394, 397, 173 A.2d 728, 730 (1961), *citing Lorenz v. Stearns*, 85 N.H. 494, 506, 161 A. 205, 212 (1932).

 The commission has traditionally performed its ratemaking function by determining a proper rate base, a reasonable rate of return thereon, and finally the amount of revenue required to produce the resulting return. *New England Tel. & Tel. Co. v. State*, 95 N.H. 353, 356, 64 A.2d 9, 13 (1949); *see* 1 A. PRIEST, PRINCIPLES OF PUBLIC UTILITY REGULATION 45 (1969). The United States Supreme Court long ago established the rule that a public utility is entitled to a return upon "the fair value of the property being used by it for the convenience of the public." *Smyth v. Ames*, 169 U.S. 466, 546 (1898). Both the company and the LUCC agree with this broadly stated standard. Their fundamental dispute is on the proper application of this standard to the facts of the present case. There is a wide area between the lowest return allowable so as not to be confiscatory, *see Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591 (1944), and the highest

return allowable so as not to be excessive and extortionate. *New England Tel. & Tel. Co. v. State*, 104 N.H. 229, 232–33, 183 A.2d 237, 241 (1962). If we deem upon review that the return ordered by the commission falls within this "zone of reasonableness," *id.*, we will not substitute our own judgment for that of the commission. *Granite State Alarm, Inc. v. New England Tel. & Tel. Co.*, 111 N.H. 235, 239, 279 A.2d 595, 598–99 (1971).

## III
### *Construction Work In Progress (CWIP)*

The most important issue that this appeal presents for our review is whether it is legal under existing statutory law for the commission to order the inclusion of CWIP in a public utility rate base. The LUCC argues that the commission's inclusion of $111,258,428 of CWIP in the company's rate base contravenes the "used and useful" requirement of RSA 378:27, which is applicable to the present case under RSA 378:28, and the "just and reasonable" principle basic to all the provisions of RSA ch. 378.

The LUCC supports its proposition that CWIP should not have been included in the company's rate base with six basic allegations. The LUCC argues:

1. That the commission improperly applied the RSA 378:27 "used and useful" requirement by defining it to include investment by a company which benefits its customers rather than limiting it to include only property in actual operation or scheduled for imminent operation.

2. That inclusion of CWIP in the rate base violates the RSA ch. 378 "just and reasonable" principle because it is inequitable for current ratepayers to pay a return for service they do not receive in order to benefit future ratepayers.

3. That including CWIP in the rate base violates the fundamental test year matching principle of public utility regulation because no revenue adjustment has been ordered to offset the inclusion of CWIP.

4. That including CWIP in the rate base is inequitable because it compels current ratepayers to pay the capital costs of construction, a role that should be played only by investors who can earn a return normally associated with investment.

5. That the commission adopted and then improperly applied the "severe financial stress" test that the Federal

Energy Regulatory Commission (FERC) employs in evaluating whether to include CWIP in the rate base of energy wholesalers. *See* 18 C.F.R. § 2.16 (1978).

6. That the commission took improper administrative notice in its final report of the company's activity in the financing area subsequent to the closing of the record without giving the LUCC notice that it would do so and an opportunity to rebut the underlying facts basic to the administrative notice.

We consider first the LUCC's argument that the commission's inclusion of CWIP in the company's rate base violates the "used and useful" requirement of RSA 328:27. We have held that the determination of whether a public utility's plant under construction and property held for future use are "used and useful" "is essentially one of fact for the Commission's determination." *New England Tel. & Tel. Co. v. State*, 95 N.H. 353, 365, 64 A.2d 9, 19 (1949). The Maryland Court of Appeals has cited our reasoning in its holding that the inclusion of CWIP in the rate base is proper so long as capitalization of CWIP in an AFUDC account is eliminated. *Baltimore Gas & Elec. Co. v. McQuaid*, 220 Md. 373, 380, 152 A.2d 825, 828 (1959); *accord, Goodman v. Pub. Serv. Comm'n*, 497 F.2d 661, 668 (D.C. Cir. 1974). We have previously allowed property held for future use to be included in the rate base. *See, e.g., Pub. Serv. Co. v. State*, 113 N.H. 497, 505–06, 311 A.2d 513, 519 (1973).

"Used and useful" is not a rigid concept; rather, it is an elastic one. *Baltimore Gas & Elec. Co. v. McQuaid*, 220 Md. 373, 379, 152 A.2d 825, 828 (1959). Whether CWIP is "used and useful" is a determination that must be made by the commission based on a careful case-by-case analysis. *See Kansas City Power & Light Co. v. State Corp. Comm'n*, 224 Kan. 86, 88, 578 P.2d 254, 256 (1978); *So. Bell Tel. & Tel. Co. v. Pub. Serv. Comm'n*, 244 S.E.2d 278, 283–84 (S.C. 1978). The commission should consider whether the CWIP asked to be included in the rate base represents the cost of money expended for raising capital to finance construction that is undertaken upon sound business judgment and in accordance with a definite plan to meet the needs of future utility consumers. *See Petition of New England Tel. & Tel. Co.*, 115 Vt. 494, 66 A.2d 135, 143 (1949). We have recognized that a public utility must be able to earn revenue sufficient "to maintain its credit and attract the necessary capital to meet increased demands for improvement and extension of its services." *New England Tel. & Tel. Co. v. State*, 113 N.H. 92, 95, 302 A.2d 814, 817 (1973), *quoting Chicopee Mfg. Co. v. Pub. Serv. Co.*, 98 N.H. 5, 11, 93 A.2d 820, 825 (1953). Allowing

the commission flexibility in applying the "used and useful" test serves to promote the public interest, *Pub. Serv. Comm'n v. Fed. Power Comm'n*, 511 F.2d 338, 353 (D.C. Cir. 1975), by allowing an energy policy that can achieve an adequate and reliable supply of electric power. *See* Smith & Lancaster, *Nuclear Power's Effects on Electric Rate Making*, Pub. Util. Fortnightly 16, 22 (February 2, 1978). Therefore, we approach our review of the commission's finding that the company's CWIP is "used and useful" fully aware that our narrow role is to determine whether the finding is "unjust or unreasonable by a clear preponderance of the evidence." *Legislative Util. Consumers' Council v. Pub. Util. Comm'n*, 118 N.H. 93, 99, 383 A.2d 89, 92 (1978).

The factual determination that the commission had to make in its used and useful analysis was whether the company's CWIP represents an expenditure incurred in raising capital to finance a reasonable construction program that will inure to the benefit of energy consumers by assuring a future supply of electricity.

Five years ago, on January 29, 1974, the commission specifically found that construction of the Seabrook nuclear powered generating facility was necessary to meet the present and future demand for electric power in this State. *See* RSA 162-F:8; *Society For the Protection of New Hampshire Forests v. Site Evaluation Comm.*, 115 N.H. 163, 167, 337 A.2d 778, 782–83 (1975). The commission's expert witness, Donald J. Trawicki, testified that the company's load growth for the ten-year period ending in 1977 was approximately eight percent annually, and that it had reached as high as twelve percent in 1975. Trawicki commented that the company's projection of a 7.3 percent annual load growth over the next ten years, a projection provided by company witness D. N. Merrill and filed exhibits, "appear[s] somewhat conservative." Further testimony by witness Merrill indicated that the company was relying upon its fifty percent ownership interest in the Seabrook facility to meet the projected increased demand for generating capability. Merrill testified that, even assuming low load growth estimates, the company would be unable to satisfy consumer demand for energy after 1982 if Seabrook were not completed. "The inevitable result," Merrill told the commission, "would be enforced power rationing with blackouts."

The commission examined a filed exhibit outlining the company's projected construction costs for Seabrook and allied projects. The exhibit, presented through the testimony of witness R.J. Harrison, vice-president, treasurer, and chief financial officer of the company, showed that the two-year projection was $296,601,000, or 63% of the total utility plant at original cost of the company at year-end 1976.

Evidence showed that the estimated construction cost to the company of its share of Seabrook and other generating facilities would be over one billion dollars through 1984. The LUCC made no substantial allegation that these projected expenditures were wasteful, and the commission's expert Trawicki, upon his analysis of the expenditures, strongly recommended the annual inclusion of $111,258,428 of CWIP in the rate base. We hold that LUCC has not sustained its burden of showing "by a clear preponderance of the evidence," RSA 541:13, that the commission erroneously found that the company's CWIP is "used and useful."

We next consider the LUCC's argument that inclusion of CWIP in the company's rate base violates the basic "just and reasonable" principle of RSA ch. 378. The thrust of the LUCC's position is that including CWIP in the rate base forces present ratepayers to pay costs that should fall on future ratepayers who will actually benefit from the plant under construction when it comes on line. The LUCC argues that the traditional AFUDC treatment of CWIP, whereby it is capitalized and collected from future ratepayers via inclusion in the rate base over the period of the useful life of the plant when it comes on line, is required by the "just and reasonable" principle. The LUCC suggests that "the inclusion of CWIP [in the current rate base] is detrimental to present consumers while providing a windfall to future consumers."

We reject the LUCC's contention that AFUDC treatment of CWIP is mandated by law. The commission's decision to include CWIP in the rate base instead of capitalizing it in an AFUDC account is a factual one to be made on a case-by-case basis. Incorporating the burden of proof standard of RSA 378:8, we hold that "the burden of proving the necessity" of including CWIP in the rate base instead of employing traditional AFUDC treatment is upon the public utility. In the present case, we cannot say that "a clear preponderance of the evidence before [us]," demonstrates that the commission erroneously decided that the company has met its burden. RSA 541:13.

We have held that a public utility must be given the opportunity to earn revenue "sufficient to assure the investor's confidence in the financial soundness of the utility and enough to maintain and support its credit so that it will be able to raise money necessary to improve and expand its service." *New England Tel. & Tel. Co. v. State*, 104 N.H. 229, 238, 183 A.2d 237, 244 (1962), *citing Chicopee Mfg. Co. v. Pub. Serv. Co.*, 98 N.H. 5, 11, 93 A.2d 820, 825 (1953). The building of a nuclear powered generating facility requires very substantial lines of bank credit for the early construction stages. Immediate financing must be

available. If credit is not forthcoming, the construction program will be jeopardized. Amyot, *supra* at 281. Because it is fundamental that ratemaking must take into account the need for the utility to maintain the confidence of investors, *Bluefield Water Works & Improvement Co. v. Pub. Serv. Comm'n,* 262 U.S. 679, 693 (1923); *accord, Federal Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 603 (1944), the commission properly exercised its regulatory function by allowing the company to prove the necessity of including its CWIP in the rate base.

The commission's decision that the inclusion of CWIP in the rate base is necessary is supported by the testimony of R. J. Harrison and E. W. Meyer. Witness Harrison indicated to the commission that the investment community no longer will supply necessary credit when the AFUDC percentage of total earnings reaches a high level because AFUDC does not represent actual cash earnings. Harrison testified that potential creditors demand adequate cash flow and adequate quality of earnings in order to assure a return on their investment. Excluding CWIP from the rate base and continuing AFUDC treatment, Harrison stated, is "just not acceptable to potential investors."

Witness Meyer, an investment banker and security broker, told the commission that because of the escalating AFUDC account attributable to the substantial construction program, the company's cash earnings were less than its dividend and interest requirements. Meyer concluded that rejection of the inclusion of CWIP in the rate base and continuation of the accumulation of AFUDC earnings would result in an inability to finance the construction program on reasonable terms.

The LUCC's expert witness, Dennis E. Logue, associate professor of business administration at Dartmouth College, disputed the testimony of witnesses Harrison and Meyer. Logue testified that the company's recent successful stock issue evidenced its continuing financial integrity. It was his opinion that the quality of AFUDC earnings was acceptable because he felt fairly certain that the company's construction program would be accomplished and the accumulated AFUDC account would go into the rate base at that time.

Commission witness Trawicki rejected Logue's analysis and supported the testimony of witnesses Harrison and Meyer. Not including CWIP in the rate base and continuing the accumulation of an AFUDC account, Trawicki testified, would jeopardize the company's construction program and make its financing "difficult or almost impossible to accomplish."

"The Commission is not compelled to accept the opinion evidence of any one witness or any group of witnesses." *New England Tel. & Tel. Co. v. State,* 104 N.H. 229, 236, 183 A.2d 237, 243 (1962); *accord, New*

*England Tel. & Tel. Co. v. State*, 95 N.H. 353, 361, 64 A.2d 9, 16 (1949). Its report demonstrates a careful consideration of all testimony concerning the choice between CWIP in the rate base and AFUDC capitalization treatment. The commission made the following decision:

> [T]here is no more sensible or sound regulatory tool for granting the needed level of revenues than by adding CWIP to the rate base. Adding CWIP has the advantage of being flexible and controllable. Moreover, once the plant goes into service the CWIP inclusion is discontinued. Therefore, the appropriate level of revenue with the appropriate timing results from using the CWIP in rate base method. In addition, it has the added benefit of a lower rate base and lower depreciation charges because of reduced AFUDC currently.

We hold that the commission's decision represents a reasonable balancing of the interests of present ratepayers, future ratepayers, and the company's investors. The decision is a policy determination that we will not disturb in exercising our appellate function even if we might have come to a different conclusion.

The LUCC next argues that by allowing inclusion of CWIP in the rate base, the commission violates the fundamental test year matching principle. The LUCC bases its assertion upon the fact that the commission ordered no revenue adjustment to offset the inclusion of CWIP in the rate base. *See Re Connecticut Light & Power Co.*, 17 PUB. U. REP. 4th 1, 21 (Conn. Pub. Util. Control Auth. 1976); *Re Iowa Power & Light Co.*, 20 Pub. U. Rep. 4th 397, 403 (Iowa Commerce Comm'n 1977). We feel that the LUCC's reasoning is misguided.

We have recognized the validity of applying the principle that revenue and expenses must be matched over a given test year. *E.g., Pub. Serv. Co. v. State*, 113 N.H. 497, 505–06, 311 A.2d 513, 519 (1973). Nevertheless, we have also noted that when considering the issue of inclusion in the rate base of property held for future use, "obviously the expense . . . could not be matched with revenue from the plant for the same period, since there was none." *Id.* at 506, 311 A.2d at 519. The argument that the matching principle bars the commission from including CWIP in the rate base elevates form over substance. To adopt it would unduly restrict the wide regulatory discretion that the legislature delegated to the commission in RSA ch. 378. *See generally New Castle County Airport Comm'n v. Civil Aeronautics Bd.*, 371 F.2d 733 (D.C. Cir. 1966), *cert. denied*, 387 U.S. 930 (1967); *C-Line Inc. v. United States*, 376 F. Supp. 1043 (D.R.I. 1974); *Shevin v. Yarborough*, 274 So. 2d 505, 510 (1973).

We note that because the method of accumulating CWIP in an AFUDC account has been eliminated, the company will be unable to match its CWIP against the revenue earned from the plant once the plant comes on line. This fact demonstrates that the dispute over whether including CWIP in the rate base or accumulating it in an AFUDC account simply "hinges on one's choice of accounting methods." *New England Tel. & Tel. Co. v. Pub. Util. Comm'n*, 116 R.I. 356, 386, 358 A.2d 1, 19 (1976). Ultimately, under either a CWIP inclusion approach or an AFUDC accumulation approach, the company's revenues are evenly matched with its expenses. The commission has the authority to select one approach or the other in its sound judgment. *See, e.g., Legislative Util. Consumers' Council v. Pub. Util. Comm'n*, 117 N.H. 972, 974, 380 A.2d 1083, 1084 (1977); *New England Tel. & Tel. Co. v. Dep't of Pub. Util.*, 360 Mass. 443, 456, 275 N.E.2d 493, 503 (1971). "[I]t is not our responsibility to choose among acceptable alternatives, but rather to determine whether the technique utilized is just and reasonable." *Goodman v. Pub. Serv. Comm'n*, 309 A.2d 97, 102 (D.C. 1973).

We next address the LUCC's argument that including CWIP in the rate base is inequitable because it casts the current ratepayer in the role of a forced investor who is not entitled to a return on his investment. The LUCC incorrectly perceives the return paid by consumers on a rate base that includes CWIP as capital contribution. Including CWIP in the rate base does not place ratepayers in the role of suppliers of capital. Rather, it requires them to pay a return on capital contributions of investors and the cost of money prior to the completion of the facility under construction.

Ratepayers will be charged the company's CWIP under either the CWIP inclusion approach or the AFUDC accumulation approach. As the LUCC concedes in its brief, the issue is only "[t]he timing of the recovery of those financing costs." The ratepayers always pay all the costs of utility investment and never are afforded a return on their money.

The commission made a policy decision to allocate the recovery of the company's CWIP to present ratepayers. The commission balanced the equities and, while recognizing that a small percentage of present ratepayers would suffer inequity because they might die or leave New Hampshire before the company's construction program is completed, decided that the public interest in the completion of the plant demanded the inclusion of CWIP in the rate base.

Ratepayers like taxpayers come and go but ratepayers like taxpayers cannot expect to be charged solely on the basis of their individual benefit. Schools and other public buildings are benefiting the taxpayers today but were fully paid for by taxpayers of yesterday.

Previous ratepayers have paid for plant construction now producing electricity being used by present ratepayers. Moreover, over a five-year period, the basic body of ratepayers will not change significantly. A large portion of present ratepayers will also be the ratepayers of 1984.

The commission also evaluated alternative ratemaking approaches to that of including CWIP in the rate base. It considered full normalization of tax benefits of accelerated depreciation and allowing a higher return on equity capital. It found that these methods were "disadvantageous and undesirable in many respects." The commission relied on witness Trawicki's testimony to reject the alternative of allowing a higher return on equity capital. Trawicki stated "that such an alternative would result in an inflated return which is unrealistic when compared to other utilities and it could have the effect of establishing an inappropriate precedent." In rejecting the option of full normalization of tax benefits from accelerated depreciation, the commission found that this method would not generate enough funds to remedy the company's revenue deficiency and also that this procedure is imprecise and not readily controllable. The commission's report elaborated on the reasoning favoring CWIP in the rate base as the most desirable ratemaking approach.

> We find that setting a rate of return higher than normal [on equity capital] would impose the same burdens on customers, that is, the rates would be the same while providing none of the advantages of the CWIP method, that is, a future reduction in rates because of a smaller future rate base. In other words, if the interest on the CWIP component is paid for today, it will not be included in the rate tomorrow. If CWIP were not allowed and the needed cash revenue were generated through a rate of return, the Company would continue to accumulate AFUDC along conventional accounting principles and eventually add this total amount to the total capitalization of plant. Thus, there would be no future reduction in rates stemming from discontinuance of AFUDC . . . .

The public utility regulating authority of another jurisdiction has endorsed this rationale, stating that "in the long run, use of AFUDC may result in a greater overall cost to the customer than inclusion in the rate base of [CWIP]." *Re Potomac Elec. Power Co.*, 11 Pub. Util. Rep. 4th 215, 227 (D.C. Pub. Serv. Comm'n 1975). The commission's reasoning is also advanced by a leading public utilities commentator

who advocates CWIP inclusion in preference to AFUDC accumulation because it "negates the need for dramatically large increase applications upon the completion of a given construction project," and thereby fosters a "leveling out of rate increase requirements." Mattutat, *A Pragmatic Approach To Construction Work In Progress*, 99 Pub. Util. Fortnightly 37 (1977).

■ The commission has not cast the ratepayer in the role of investor as the LUCC has argued. Rather, the commission exercised its discretion in arriving at a ratemaking procedure it regarded as imposing the least burden on the New Hampshire energy consumer over the next several years while assuring the completion of the company's construction program. We will not substitute our judgment for that of the commission.

The LUCC has further argued that the commission adopted and then improperly applied the "severe financial stress" test employed by the Federal Energy Regulatory Commission (FERC) under the guidelines of 18 C.F.R. § 2.16 (1978). It is unclear from the record or the commission's report whether it did in fact adopt the FERC standard utilized in determining the necessity of including CWIP in the rate base. It certainly was not required to adopt the standard under any rule of State law. As we have previously stated, the test the commission must employ in considering inclusion of CWIP in rate base is whether the company has carried "the burden of proving the necessity" of employing this ratemaking device. *See* RSA 378:8.

■ We have already cited ample evidence from the record to support the commission's finding that CWIP in the rate base is necessary to the company's successful completion of its construction program. The commission received evidence of the company's increased capital requirements, depressed earnings, and reduced cash flow and internal generation of funds. Its own expert witness, Mr. Trawicki, testified that without the substantial new revenue that CWIP in the rate base would provide, the company's financing program would be "difficult or almost impossible to accomplish." Trawicki's most compelling testimony was that without CWIP in the rate base, the company would "teeter precariously on the brink of financial disaster." The record supports the commission's finding under either the FERC "severe financial stress" test or under the test requiring the "proving of necessity" that we have enunciated today. We note that the FERC initially decided to include CWIP in the company's rate base for the purpose of establishing rates for its wholesale customers. *Re Pub. Serv. Co.*, Nos. EL 78-15; ER 78-339 (FERC January 26, 1979).

■ The LUCC's final argument urging reversal of the commission's decision to include CWIP in the company's rate base is that the commission's administrative notice of certain records and events in its final report is error. We agree with the LUCC that the commission's taking notice of the company's financing activity subsequent to the closing of the record is erroneous. *Legislative Util. Consumers' Council v. Pub. Util. Comm'n*, 118 N.H. 93, 99–100, 383 A.2d 89, 93 (1978). The commission could properly take notice, however, of all records and annual reports that were in its own file and were thus matters of public record. *New England Tel. & Tel. Co. v. State*, 113 N.H. 92, 101–02, 302 A.2d 814, 821 (1973); *Granite State Alarm, Inc. v. New England Tel. & Tel. Co.*, 111 N.H. 235, 238, 279 A.2d 595, 597–98 (1971). We note that twice during the proceedings the commission announced to all parties that it would take such notice. *See Legislative Util. Consumers' Council v. Pub. Util. Comm'n*, 118 N.H. 93, 101, 383 A.2d 89, 93 (1978).

We hold that the commission's error in taking notice in its final report of the company's financing activity subsequent to the closing of the record is harmless. *See id.* The commission, when taking notice of facts and information that appear neither in its own records nor in the record of the hearings, must give all parties adequate notice, providing them with an opportunity to challenge and rebut the matters to be administratively noticed. *Id.* Administrative notice may not be taken contemporaneously with the rendering of the decision. *See id.* Although the commission erred in taking notice of evidence outside of the record concerning the company's financing activity, the error is harmless because the commission had sufficient evidence before it independent of the financing activity information to warrant its inclusion of CWIP in the rate base. *See id.*

## IV

### Test Year Methodology

The commission adopted an unadjusted test year ending April 30, 1977, as the standard for the determination of the company's revenue requirements. The commission also employed an average compiled from balance sheet entries in determining rate base even though it calculated the company's income as of a given "year-end" point in time without any averaging. The LUCC argues both that the commission was required by law to adopt an adjusted test year and that using different test year methods in determining the base and income violates the matching principle.

■ The LUCC's arguments must be rejected because their basic thrust is that the commission is bound by rigid principles and formu-

las in its determination of fair rates. The LUCC's arguments "only illustrate the extreme factual complexity of any particular case. This court would be ill-advised to create per se rules which would needlessly interfere with the exercise of Commission expertise." *Goodman v. Pub. Serv. Comm'n*, 497 F.2d 661, 669 n.27 (D.C. Cir. 1974). It is nearly impossible for the commission to represent precisely the existing financial picture of a public utility company. *Windham Estates Ass'n v. State*, 117 N.H. 419, 425, 374 A.2d 645, 649 (1977). The commission's decisions involving test year methodologies are for the exercise of its discretion and are not " 'erroneous as a matter of law.' " *New England Tel. & Tel. Co. v. State*, 104 N.H. 229, 240, 183 A.2d 237, 245 (1962), *quoting Pub. Serv. Co. v. State*, 102 N.H. 150, 157, 153 A.2d 801, 807 (1959).

The statutory scheme for public utility regulation mandated by the legislature in RSA ch. 378 clearly expresses an intent that the commission be afforded wide parameters within which to exercise its judgment. RSA ch. 378 is conspicuously devoid of any prescribed methodologies. "Financial, accounting, and economic experts can and do regularly disagree; . . . and rate regulation is more art than it is a procedure susceptible of expression in precise mathematical terms." *Amyot, supra* at 247. Because of the inexactness inherent in the process of public utility ratemaking, the legislature has provided a system requiring that the commission's order be "just and reasonable." RSA ch. 378. The statutory system allowing the commission wide latitude in the choice of methodologies has long been upheld by this court. *E.g., Chicopee Mfg. Co. v. Pub. Serv. Co.*, 98 N.H. 5, 93 A.2d 820, (1953). "It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end." *Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944); *accord, Pub. Serv. Co. v. State*, 113 N.H. 497, 503, 311 A.2d 513, 518 (1973). We therefore uphold the commission's choice of test year methodology.

## V

### *The Tariff*

The tariff filed by the company pursuant to RSA 378:3 requesting a rate increase was designed to produce additional revenues of $27,027,050. Although the company did not formally file a second tariff, it requested a revenue increase of $31,997,602 during the hearings, and was awarded $30,134,232 in the commission's final report and order. In its order, the commission directed the company to "file a new tariff, N.H. P.U.C. No. 22 . . . designed to produce an annual increase in

gross revenue of . . . ($30,134,232)." The LUCC argues that the revenue increase ordered by the commission is illegal because it exceeds the company's filed proposal and because "[a]ny tariff which exceeds the filed tariff is not just and reasonable."

■■ We begin our discussion of this issue by observing that it was not good practice for the commission to grant the company a revenue increase in advance of its having demanded a formal filing of a revised tariff. The public perception of the procedural fairness of the commission's hearings and investigative process would have been enhanced in the present case if the commission had ordered the formal filing of a revised tariff when it became apparent that the company was actually seeking a revenue increase some five million dollars in excess of that requested in its filed tariff. We strongly suggest that the commission adopt this practice in the future. Yet we reject the LUCC's elaborate interpretation of the legislative intent of RSA ch. 378, and hold that it was not an error of law for the commission to grant a revenue increase in excess of that requested in the company's formally filed tariff.

■ The commission's statutory authority to grant revenue increases not formally requested is found in RSA 378:3. Using language that gives the commission unfettered discretion within the basic "just and reasonable" requirement of RSA ch. 378, the legislature has accorded the commission power to make changes in rates upon its own motion. RSA 378:3. The legislature's intent to delegate broad authority to the commission to allow revenue increases is reinforced in RSA 378:7. "Since it is the duty of the commission to establish reasonable and just rates, there is no statutory limitation which confines [it] to filed rates. . . ." *Chicopee Mfg. Co. v. Pub. Serv. Co.*, 98 N.H. 5, 21, 93 A.2d 820, 830 (1953). In the present case, the evidence supports the commission's determination of the allowable revenue increase and rate hike. "Just and reasonable rates is the touchstone" for the commission's establishment of new rates. *New England Tel. & Tel. Co. v. State*, 104 N.H. 229, 232, 183 A.2d 237, 240 (1962). That standard is the only requirement imposed by statute. We hold that the commission complied with it in the revenue increase order.

## VI

### *Nonutility Material and Supplies*

The commission included in the company's rate base $82,542 for appliance and appliance repair materials and supplies. The LUCC argues that this inclusion is error both because it relates to nonutility operations of the company and because there was testimony in the

record that the company would no longer be engaged in the appliance business as of the effective date of the new tariff. We agree with both of the LUCC's propositions.

■ Property not devoted to the production and delivery of energy to the consumer is not includible in the rate base. *See* I A. Priest, *Principles of Public Utility Regulation*, 174 (1969). We can envision no set of circumstances where it could be said that the company's pursuit of an appliance business is devoted to meeting the energy needs of its customers. Further, all parties concede that the commission erred in including this item in rate base because, although the company was involved in the appliance business during the test year, it had ceased such operations by the time the tariff took effect. Therefore, even if the $82,542 did represent utility operations, it would not be includible in the rate base because it represents nonrecurring investment.

■ The commission's error, however, does not require either reversal or remand. Although we admonish the commission for its mistake and remind it that the statutory scheme relies on it to apply carefully its expertise, we remain ever cognizant of our narrow scope of review in rate order appeals. Even if we were to remand for removal of the appliance and appliance repairs item from rate base, the increase in revenues ordered by the commission would be reduced by only $13,403. The actual tariff effected by the company is designed to produce revenue $46,497 less than that actually ordered by the commission. Thus the commission's error does not prejudice the ratepayers. Because the rate of return can be justified in this case as just and reasonable, any defects in the method of arriving at it need not vitiate it. *See Chicopee Mfg. Co. v. Pub. Serv. Co.*, 98 N.H. 5, 12, 93 A.2d 820, 825 (1953).

## VII

### *Conclusion*

In summary, we sustain the commission report and eleventh supplemental order No. 13,162. We emphasize that we do not sit as a trier of fact in appeals from the Commission. *Legislative Util. Consumer's Council v. Pub. Util. Comm'n*, 118 N.H. 93, 99, 383 A.2d 89, 92 (1978), and recognize the soundness of having utility ratemaking matters determined by a commission of experts qualified to make informed judgments in this specialized field. *Spintman v. Chesapeake & Potomac Tel. Co.*, 254 Md. 423, 429, 255 A.2d 304, 307 (1969). We will reverse commission decisions only when they are unlawful, unreasonable, unjust or constitute an abuse of discretion. *See New England*

*Tel. & Tel. Co. v. Pub. Util. Comm'n*, 390 A.2d 8, 30 (Me. 1978). The present case is not one of those instances.

*Appeal dismissed.*

DOUGLAS, J., concurred specially; the others concurred.

DOUGLAS, J., concurring: I agree that under the established standard of review we cannot reverse the commission's decision permitting the inclusion of CWIP in the rate base even though we might have reached a different conclusion had we been the triers of fact initially. In my opinion, the court simply concludes that prior to the recent passage of Laws 1979, ch. 101, the commission could have reached the conclusion that it did relative to CWIP.

What does concern me about the majority opinion is the indication that the "end result" test of *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944), may be the standard for appellate review of agency ratemaking decisions in this State. The majority in *Hope* said:

> [W]hen the Commission's order is challenged in the courts, the question is whether that order "viewed in its entirety" meets the requirements of the Act. . . . Under . . . "just and reasonable" it is the result reached not the method employed which is controlling . . . If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important.

*Id.* at 602.

I agree with the dissenters in *Hope* that to so hold encourages "conscious obscurity or confusion in reaching a result, on the assumption that so long as the result appears harmless its basis is irrelevant." *Id.* at 627 (Frankfurter, J., dissenting). As Mr. Justice Jackson said in his dissent, "If we are to hold that a given rate is reasonable just because the Commission has said it was reasonable, review becomes a costly, time-consuming pageant of no practical value to anyone." *Id.* at 645.

The "end result" test is inconsistent with our previous statement that the commission is not relieved "from the duty to disclose the 'method employed' to reach the prescribed rates, so that the validity of its conclusions may be tested upon judicial review." *New England Tel. & Tel. Co. v. State*, 95 N.H. 353, 357, 64 A.2d 9, 14 (1949). Our duty is to examine fully the methodology of the commission in arriving at its

ratemaking order. Although the majority suggests that it is using the "end result" standard, its opinion does nonetheless examine the commission's methodology and the evidence before the commission in great detail. I therefore concur in the decision.